IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL J. BOST, et al.,

       Plaintiffs,

v.

THE ILLINOIS STATE BOARD OF
ELECTIONS, et al.,

       Defendants.

Civil Action No. 1:22-cv-02754

**MEMORANDUM IN SUPPORT OF**
**<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## **<u>TABLE OF CONTENTS</u>**

<u>Page No.</u>

INTRODUCTION ...................................................................................................................1

STATUTORY BACKGROUND ............................................................................................2

SUMMARY JUDGMENT STANDARD ...............................................................................3

ARGUMENT .........................................................................................................................4

I.     Illinois' Receipt Deadline Contravenes the Text of Federal Election Day
Statutes ........................................................................................................................4

     A.    Illinois' Receipt Deadline  Violates Federal Law By Allowing Voting
to Continue Fourteen Days After Federal Election Day ...........................................4

     B.    Congress Intended that Election Day Was the Day Of "Final Selection" ..............8

II.    The Ordinary Plain Meaning of Election Day Is the Date by Which Ballots
Must Be Received By State Election Officials ...........................................................8

     A.    Illinois' Receipt Deadline Is Wholly Unmoored From its Ordinary Public
Meaning in 1845 or 1872 ........................................................................................9

          1.    There Was No Common Law Right to Vote Absentee ............................10

          2.    It Remained Physically Impossible for Votes to Be Received After
Election Day for Most of the 19th Century .................................................11

          3.    Even During the Civil War Absentee Ballots Were Not Cast Until
Received by State Officials on Election Day.............................................13

          4.    Until Very Recently, the Original Public Meaning of Election Day
Was Nearly Universal ..............................................................................15

III.    Illinois' Receipt Deadline Burdens Plaintiffs' Right to Vote and Right to Stand for
Office Under the First and Fourteenth Amendments and Violates 42 U.S.C. § 1983 .......16

CONCLUSION......................................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                 <u>Page No.</u>

*Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944 (7th Cir. 2019) ................................17

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................................17, 18, 20

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ...................................11

*Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021)..........................................18, 20

*Bank of Commerce v. Hoffman*, 829 F.3d 542 (7th Cir. 2016) ........................................3

*Bloome v. Hograeff,* 61 N.E. 1071 (Ill. 1901)................................................................5, 13

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) ....................................................9

*Burdick v. Takushi*, 504 U.S. 428 (1992)................................................................17, 18, 20

*Burns v. Alcala*, 420 U.S. 575 (1975) ........................................................................9

*Burson v. Freeman*, 504 U.S. 191 (1992) ...........................................................9, 11, 12, 13

*Cook v. Gralike*, 531 U.S. 510 (2001) ....................................................................2, 20

*Doe v. Reed*, 561 U.S. 186 (2010) ...........................................................................11

*Ex parte Siebold*, 100 U.S. 371 (1880) ......................................................................2

*Ex parte Yarbrough*, 110 U.S. 651 (1884)................................................................12

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) ........................................................20

*Foster v. Love*, 522 U.S. 67 (1997)................................................................ *passim*

*Goodell v. Judith Basin Cty.*, 224 P. 1110 (1924) ......................................................15

*Hughey v. United States*, 495 U.S. 411 (1990) ........................................................8

*Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860 (7th Cir. 2016) ....................................8-9

*K Mart Corp. v. Cartier*, 486 U.S. 281 (1988) ......................................................9

*Libertarian Party of Illinois v. Scholz*, 872 F.3d 518 (7th Cir. 2017) ..........................18

*Love v. Foster*, 90 F.3d 1026 (5th Cir. 1996) .............................................................17

*Lynch v. Malley*, 74 N.E. 723 (Ill. 1905) ................................................................5, 11

*Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (Mont. 1944) ............................4, 13

*Millsaps v. Thompson*, 259 F.3d. 535 (6th Cir. 2001) .....................................2, 6, 8, 17

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ..................................................9

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019)......................................................9

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 2022 U.S. LEXIS 3055 (June 23, 2022)......................16

*Perrin v. United States*, 444 U.S. 37 (1979) ..............................................................9

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014)...................................................9, 14

*Smiley v. Holm*, 285 U.S. 355 (1932) .......................................................................2

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ...................................13

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995)...................................................2

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773 (5th Cir. 2000)............................2, 6, 7, 17

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169 (9th Cir. 2001) ........................... *passim*

## **Constitutional Provisions**

U.S. Const. art. I, § 4 cl.1 ..................................................................... *passim*

U.S. Const. art. II, § 1 cl.4 ..................................................................... *passim*

U.S. Const. art. VI, cl.2.................................................................................20

U.S. Const. amend. I ...................................................................................17

U.S. Const. amend. XIV ..............................................................................17

**Federal Statutes**

2 U.S.C. § 1 ..................................................................................................3

2 U.S.C. § 7 ........................................................................................... *passim*

3 U.S.C. § 1 ........................................................................................... *passim*

26 U.S.C. § 7502 ...........................................................................................11

52 U.S.C. § 10101 ..........................................................................................6

**State Statutes**

10 ILCS 5/18A-15(a) ......................................................................................3

10 ILCS 5/19-8(c) .................................................................................. *passim*

Cal. Elec. Code § 3020 .................................................................................15

Neb. Rev. Stat. Ann. § 32-950 .....................................................................15

**Federal Rules**

Fed. R. Civ. P. 56 ...........................................................................................3

**Other Authorities**

Charles Kettleborough, THE AMERICAN POLITICAL SCIENCE REVIEW,
   Vol. 11, No. 2 (May 1917) ......................................................................14

Charles Stewart III, *How We Voted in 2020: A First Look at the Survey of the
   Performance of American Elections*, MIT Election Data + Science Lab,
   (Dec. 15, 2020) ........................................................................................16

Cortland F. Bishop, HISTORY OF ELECTIONS IN THE AMERICAN COLONIES (1893) .....................10

Donald A. Debats, HOW AMERICA VOTED: BY VOICE,
   Univ. of Virg. Inst. For Advanced Tech. in Humanities (2016) ........................13

E. Evans, A HISTORY OF THE AUSTRALIAN BALLOT SYSTEM
   IN THE UNITED STATES (1917).....................................................12, 13

THE FEDERALIST NO. 59 (C. Rossiter ed. 1961) (A. Hamilton) ............................................... 11-12

George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS
(Henry L. McCune eds. 4th ed. 1897) ..........................................................11, 19

J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES (1934) .............................13, 15, 16

James H. Lewis and Albert H. Putney, HANDBOOK ON ELECTION LAWS (1912) .........................12

Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh,
CONGRESSIONAL INTRUSION TO SPECIFY STATE VOTING
DATES FOR NATIONAL OFFICES, PUBLIUS: THE JOURNAL OF FEDERALISM .................11, 12

John C. Fortier, ABSENTEE AND EARLY VOTING: TRENDS, PROMISES, AND PERILS,
AEI Press (2006)...............................................................................................14

Josiah Henry Benton, VOTING IN THE FIELD (1915) .........................................13, 14, 19

Kirk H. Porter, Ph.D., HISTORY OF SUFFRAGE IN THE UNITED STATES (1918) .............................10

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
(Joseph E. Worcester, *et al*. eds. 1st ed. 1830)....................................................10

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
(Joseph E. Worcester, *et al*. eds. 2nd ed. 1860) ..................................................10

P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW,
Vol. 12, No. 2 (May 1918)..................................................................................14

P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW,
Vol. 12, No. 3 (Aug. 1918) .................................................................................15

Scott Rasmussen, "70% Want All Mail-In Ballots Received By
Election Day," ScottRasmussen.com (July 13, 2021) .........................................9

Scott Rasmussen, "80% Favor Requiring Photo ID Before Casting a Ballot,"
ScottRasmussen.com (Jan. 17, 2022) .................................................................9

*The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm.
on Rules and Admin.*, 95th Cong. 33-34 (1977) ................................................15

## <u>INTRODUCTION</u>

More than 175 years ago, Congress established the Tuesday after the first Monday in November of every even-numbered year as the uniform national election day in the United States ("Election Day"). A survey of history from that time and since shows that the ordinary public meaning of Election Day was the day by which all ballots must be received by state election officials. Simply stated, Election Day meant ballot-receipt day. That near-universal public meaning prevailed until about 20 years ago when some state legislatures, including Illinois' General Assembly, rewrote longstanding laws holding voting open days and sometimes weeks after Election Day. This lawsuit challenges the 2005 amendment to 10 ILCS 5/19-8(c) ("Receipt Deadline"), which holds voting open in Illinois for fourteen days after Election Day. Because the "combined actions of voters and officials meant to make the final selection" in Illinois continues fourteen days after Election Day, its Receipt Deadline violates federal Election Day statutes. *See Foster v. Love*, 522 U.S. 67, 71-72 (1997).

Plaintiffs are three registered Illinois voters, one of whom is a member of the United States House of Representatives seeking reelection in 2022. The other two are Republican appointees who served as nominees for presidential and vice-presidential electors in the Electoral College. All have sued to enjoin the enforcement of Illinois' Receipt Deadline on the grounds that it contravenes the ordinary public meaning of Election Day as set forth in 2 U.S.C. § 7 and 3 U.S.C. § 1. Plaintiffs seek to protect their rights under the First and Fourteenth Amendments to the U.S. Constitution.

Plaintiffs respectfully request that the Court grant its Motion for Partial Summary Judgment with respect to Counts I and II as they relate to the November 8, 2022 federal election.[1] Plaintiffs seek a declaratory judgment that Illinois' Receipt Deadline violates 2 U.S.C. § 7 and Plaintiffs' First and Fourteenth Amendment rights and an order from the Court scheduling remedial proceedings as appropriate.

## STATUTORY BACKGROUND

The United States Congress is authorized under U.S. Const. art. I, § 4 cl.1 and art. II, § 1 cl.4 to establish the Time for conducting federal elections.

> [T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932) (discussing Congress' art. I, § 4 powers). These two clauses give "Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States."[2] *Foster*, 522 U.S. at 69 (citing *Thornton*, 514 U.S. at 832-833). Federal election laws governing federal elections "are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1880).

Congress exercised this authority almost 200 years ago when it enacted the first of a trio of statutes that established the Tuesday after the first Monday in November of every even-

---

[1]    Disputes regarding state compliance with federal Election Day statutes are commonly handled via summary judgment. *See Foster*, 522 U.S. at 70; *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169, 1170 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d. 535, 536 (6th Cir. 2001); and *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773, 774 (5th Cir. 2000).

[2]    The Article II delegation of authority is the states' sole basis for regulating presidential elections. This power is neither inherent nor persevered under the Tenth Amendment. *Cook v. Gralike*, 531 U.S. 510, 522 (2001); *U.S. Term Limits v. Thornton*, 514 U.S. 779, 805 (1995).

numbered year as the uniform Election Day.  In 1845, Congress passed the "Presidential Election Day Act," which is now codified as 3 U.S.C. § 1.  28 Cong. Ch. 1, 5 Stat. 721.[3]  Twenty-seven years later, Congress passed what is now 2 U.S.C § 7, establishing the same day for congressional elections.  In 1914, following the adoption of the Seventeenth Amendment, Congress aligned Senate elections with those in the House.  2 U.S.C. § 1.

Prior to 2005, Illinois law required that absentee ballots must be postmarked the day preceding Election Day and received by state election officials on or before Election Day.  2005 Ill. Laws 557 (P.A. 94-557).  In 2005, Illinois' Receipt Deadline was amended to allow absentee ballots received "after the close of the polls on election day" but before "the close of the period for counting provisions ballots" to be counted as if cast and received on or before Election Day.[4]  *See* 2005 Ill. Laws 557 (P.A. 94-557).  Election officials shall complete the "the validation and counting of provisions ballots within 14 calendar days of the day of the election."  10 ILCS 5/18A-15(a).  Read together, these two provisions mean that VBM ballots received up to 14 calendar days after Election Day shall be counted as if cast and received on or before Election Day.

## SUMMARY JUDGMENT STANDARD

Plaintiffs are entitled to summary judgment when they show that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Bank of Commerce v. Hoffman*, 829 F.3d 542, 545-46 (7th Cir. 2016).  Where the "case concerns only legal issues, and no facts are in dispute," summary judgment is proper.  *Keisling*, 259 F.3d at

---

[3]     Originally codified as 5 Stat. 721, non-material wording changes occurred over the years before it was recodified as 3 U.S.C. § 1.

[4]     10 ILCS 5/19-8(c) was expanded in 2013 to include vote-by-mail ("VBM") ballots.  2013 Ill. Laws 1171 (P.A. 98-1171).  By expanding VBM, Illinois materially increased the number eligible voters who could avail themselves of the State's new practice of holding voting open fourteen days after federal Election Day.

3

1170 (reviewing summary judgment ruling on whether Oregon's early voting statutes violated federal Election Day statutes). Indeed, the "issue here [is] a narrow one turning entirely on the meaning of the state and federal statutes." *Foster*, 522 U.S. at 71. Under those standards, 10 ILCS 5/19-8(c)'s validity can be decided by this Motion to determine Plaintiffs' rights under federal law.

## ARGUMENT

## I.  Illinois' Receipt Deadline Contravenes the Text of Federal Election Day Statutes.

Congress has plenary power under U.S. Const. art. I, § 4 cl. 1 and art. II, § 1 cl. 4 to regulate the Time for federal elections. Unquestionably, 2 U.S.C. § 7 and 3 U.S.C. § 1 are valid exercises of this power, *see Foster*, 522 U.S. at 70, and no otherwise valid state regulation can limit or abridge a valid exercise of this federal power. *Id.* at 71-72; *see also Keisling*, 259 F.3d at 1170 ("Without question, Congress has the authority to compel states to hold these elections on the dates it specifies.").

### A.  Illinois' Receipt Deadline Violates Federal Law by Allowing Voting to Continue Fourteen Days After Federal Election Day.

Congress "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. In *Foster*, the Court defined "election" as used in the Election Day statutes. "When the federal statutes speak of 'the election' […], they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Id.* at 71. Put differently, this "final act of selection," *id.* at 72, "means a 'consummation' of the process of selecting an official." *Keisling*, 259 F.3d at 1175.

Voters' role in the "final act of selection" includes not just marking a ballot but also "having it delivered to the election officials and deposited in the ballot box." *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944) (citation omitted). Thus, the "consummation" or the

"final act of selection" does not occur until *ballots are received* by state election officials. The Montana Supreme Court described the effects of voting innovations on this process:

> Nothing short of the delivery of the ballot to the election officials for deposit in the ballot box constitutes casting the ballot, which fact was unmistakable so long as the ballot continued to be, as originally, a ball or marble or other marker which was "cast" or deposited in an official receptacle or custody. The fact that the ballot has now become a sheet of paper upon which the voter's choices for the various offices are marked before it is deposited has not changed either the word used to characterize the act of casting the ballot, or the meaning of the word.

*Id.* For "[i]t is not the marking but the depositing of the ballot in the custody of election officials which constitutes casting the ballot or vot[ing]."[5] *Id.* After all, a ballot has "no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective." *Id.* Stated differently, it is the receipt of a qualified ballot by state election officials that transforms a ballot into a vote.[6] Under Illinois' Receipt Deadline, that "final act of selection" now continues as much as fourteen days after Election Day.

This concept is illustrated by reviewing the status of a ballot once it is received by a voter. The ballot sitting in a voter's kitchen waiting to be completed is not a vote. Even once it is marked, its status does not change. Nor does it change once it is handed to a third party (*i.e.*, U.S. Postal Service or ballot harvester) for delivery. Likewise, a ballot in transit or sitting in the Postal Service's distribution center is not a vote. A ballot that is lost, stolen, or destroyed is not a vote. A ballot is not a vote until it is properly marked *and* received by the election official. At receipt, a qualified ballot becomes a vote that can be counted during canvassing. This concept has long

---

[5] *Cf. Bloome v. Hograeff,* 61 N.E. 1071, 1071-72 (Ill. 1901) (allowing ballots received by state election officials on Election Day, but not physically deposited into a ballot box, to be counted).

[6] "A ballot originally consisted of a little ball, a bean or a grain of corn, a coin, or any other small article which could be concealed in the hand so that others might not know how the voter cast his ballot." *Lynch v. Malley*, 74 N.E. 723, 725 (Ill. 1905).

been recognized under federal law.  For example, when Congress passed the Civil Rights Act of 1957 it defined a "vote [as including] all action necessary to make a vote effective including […] casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast[.]"  52 U.S.C. § 10101(e).  It is axiomatic that "all actions necessary" includes casting *and* receiving the ballot for canvassing.

Given the "binding" federal requirements, *Foster*, 522 U.S. at 69, of these "combined actions" and the consummation of the process of selecting an official, the Supreme Court had no problem finding that Louisiana's election regime violated federal law if "the combined actions of voters and officials meant to make a final selection of an officeholder" occur "*prior* to federal election day."  *Id*. at 71, 72 n.4 (emphasis added).  There, the Court unanimously invalidated Louisiana's election regime that held congressional elections in October.  Louisiana's regime was thus constitutionally flawed because it established "a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress."  *Id.* at 72.  Similarly, the "final act of selection" of federal candidates in Illinois continues as a matter of state law as much as fourteen days after Election Day and can *never* be concluded on Election Day.

The Fifth, Sixth, and Ninth Circuits have all considered the meaning of "Election Day," but only in evaluating whether state early voting practices complied with federal law.  In those cases, courts ruled such practices did not violate federal law because they did not consummate the election before Election Day or alter the "final act of selection."  *See Keisling*, 259 F.3d at 1175-76; *Bomer*, 199 F.3d at 775-77; *Millsaps*, 259 F.3d at 543-46.  Early absentee voting merely complements other "voting," which "still takes place on" Election Day, which was the day of the "final selection of an officeholder."  *Keisling*, 259 F.3d at 1175, 1176 (quoting *Foster*, 522 U.S. at

71); *see also Bomer*, 199 F.3d at 776 ("Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day.").  Stated differently, the collective voters' "final selection" still occurs no earlier or later than Election Day, even if post-election canvassing still remains to be done.[7]

Illinois' Receipt Deadline violates 2 U.S.C. § 7 and 3 U.S.C. § 1 for the same reason that Louisiana's system did in *Foster*.  Here, because the "final selection" of candidates can never be by consummated on Election Day, it does not, in fact, take place on the date chosen by Congress. *Foster*, 522 U.S. at 71-72.  State election regimes can no more require "the combined actions of voters and officials meant to make a final selection of an officeholder" occur prior to Election Day than they can allow these combined actions to continue fourteen days *after* Election Day.  *See id.* Louisiana's former, and Illinois' current, election regimes both "affect the timing of federal elections"— an October election in Louisiana "requires no further act by anyone to seal the election" on Election Day, *id.* at 73, while holding voting open fourteen days after Election Day in Illinois requires "further act[s]" intended to influence the final result of a federal election. *Id.* Both contravene Congress' "final say" about the time for federal elections and "clearly violate" 2 U.S.C. §7 and 3 U.S.C. § 1.  *Id.* at 72.

As a matter of law, Illinois' Receipt Deadline allows a "contested selection of candidates" to continue after Election Day.  *Foster*, 522 U.S. at 72.  It requires state election officials to continue to accept and count ballots received long after the national Election Day.  On its face, it morphs the singular "day for the election" into fourteen days.

---

[7] The fact that state law allows certification to occur several weeks after Election Day does not change this analysis.  Otherwise, states could collaterally attack Congressional Time regulations by simply extending the certification processes.

**B.      Congress Intended that Election Day Was the Day Of "Final Selection"**

The pre-enactment legislative history surrounding Election Day statutes shows that Congress considered and rejected requests for a multiday Election Day in both 1845 and, especially, in 1872.  *Keisling*, 259 F.3d. at 1169-74 (discussing the legislative history surrounding Election Day); *see also Millsaps*, 259 F.3d at 540-43.  Other federal statutes in Title 2 and 3 emphasize Congress' intent that Election Day, and not fourteen days later, is the deadline for "final selection."  *See* 3 U.S.C § 2 ("Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law[.]"); and 2 U.S.C. § 8 ("whether such vacancy is caused by a failure to elect at the time prescribed by law[.]").  If all voters' "final selections" are not complete by Election Day, then the final selection cannot be ascertained within "the time prescribed by law."  In consequence, federal elections in Illinois suffer from the same fatal flaw as federal primaries in Louisiana: the final selection of candidates for office is not concluded as a matter of law on Election Day.  *Foster*, 522 U.S. at 72.

"By establishing a particular day as 'the day' on which [the final selection] must take place, the statutes simply regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say." *Id.* at 71.  No state-enacted time or manner regulation may alter a time regulation after Congress has spoken. *Id.*

**II.      The Ordinary Plain Meaning of Election Day Is the Date by Which Ballots Must Be Received By State Election Officials.**

A historical survey confirms this textual analysis.  From 1845 until circa 2005, the unmistakable historical practice was that Election Day was the day of final action and that final action was the act of state election officials receiving ballots.  Election Day was ballot receipt day.

As with all questions of statutory interpretation, the analysis starts with the text of the statute to ascertain its plain meaning. *Hughey v. United States*, 495 U.S. 411, 415 (1990); *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). "[T]he court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988) (citations omitted). A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, common public meaning at the time of enactment. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020); *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580-581 (1975)). "[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted). This inquiry often looks to the development and evolution of the common-law definition, *id.*, or refers to dictionaries contemporaneous with the enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 228 (2014).

**A.      Illinois' Receipt Deadline Is Wholly Unmoored From the Ordinary Public Meaning of Election Day in 1845 or 1872.**

Election Day has improved a lot since the 19th century. *See generally Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1882-83 (2018) (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)). While society and election administration has benefited from these changes, the recent efforts to radically redefine Election Day by extending it for weeks beyond the Tuesday next after the first Monday in November has done tremendous damage to public confidence in elections.[8] More to the point, it violates the original public meaning of 2 U.S.C. § 7 and 3 U.S.C. § 1.

---

[8]      A recent national survey found that 76% of respondents want all ballots in by Election Day. Scott Rasmussen, "80% Favor Requiring Photo ID Before Casting a Ballot," ScottRasmussen.com

Dictionaries published before and after 1845 define "election" as "[t]he *day* of a public choice of officers," emphasizing the temporal nature of this regulation. Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, 288, (Joseph E. Worcester, *et al*. eds. 1st ed. 1830), available at https://bit.ly/3lNC9nG; and Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, 383, (Joseph E. Worcester, *et al*. eds. 2nd ed. 1860), available at https://bit.ly/3LK7ZMF (emphasis added). This emphasis on time and electoral practices before and after 1845 speak to the ordinary public meaning of election. A historical survey of these practices leaves little doubt that the original public meaning of election meant the final act of selection and that act was receipt of ballots.

1. <u>There Was No Common Law Right to Vote Absentee</u>

Colonial electoral practices can be grouped together depending on whether the colony followed Puritan, British royal, or some other proprietary rules. *See* Cortland F. Bishop, HISTORY OF ELECTIONS IN THE AMERICAN COLONIES, 98-99 (1893), available at https://bit.ly/3yso7xC; and Kirk H. Porter, Ph.D., HISTORY OF SUFFRAGE IN THE UNITED STATES, 1-3 (1918), available at https://bit.ly/3RsJ9ES (explaining that colonies were essentially corporations and the right to vote was "much the same" as a stockholder's right to vote). Many of these electoral practices lasted through the American Revolution and early republic. *See* Porter at 1-3; and *see generally* Bishop at 1-45. While some colonial corporations later enacted rules allowing limited proxy voting, it was unknown under the common law and all votes needed to be "personally given" at poll sites.[9]

---

(Jan. 17, 2022), https://bit.ly/3aupaFn. This finding was up 6% from a previously poll less than a year before. Scott Rasmussen, "70% Want All Mail-In Ballots Received By Election Day," ScottRasmussen.com (July 13, 2021), https://bit.ly/3OYyJvd.

[9] Certain areas of colonial America allowed limited "proxy voting." *See* Bishop at 127-40. In its basic form, proxy voting allowed eligible voters to assign their vote to a qualified proxy who was required to appear in person on Election Day to cast the assigned vote. *Id.*

George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS, 132 (Henry L. McCune eds. 4th ed. 1897) available at https://bit.ly/3PlGMCa.[10]

"During the colonial period, many government officials were elected by the *viva voce* method or by the showing of hands, as was the custom in most parts of Europe." *Burson*, 504 U.S. at 200; *see also Doe v. Reed*, 561 U.S. 186, 224-27 (2010) (Scalia, J., concurring in judgment) (describing historic voting practices). It was simply not physically possible during this time for votes, whether conducted *viva voce* or by electors dropping balls or beans in a bowl, to be received after Election Day. [11]

2. It Remained Physically Impossible for Votes to Be Received After Election Day for Most of the 19th Century.

After the Constitution's ratification, concerns immediately arose about the federal government relying on states to fulfill their duties to conduct federal elections. *See* Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh, CONGRESSIONAL INTRUSION TO SPECIFY STATE VOTING DATES FOR NATIONAL OFFICES, PUBLIUS: THE JOURNAL OF FEDERALISM, Vol. 38, Issue 1, Winter 2008, Pages 137–151 available at https://bit.ly/3uEBrh5. In particular, Congress was unsure whether states would conduct timely elections, especially for the newly created office of the president, or whether the states would appoint electors at all. *Id*. at 140-41; *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) (discussing the Framers' purpose for adopting the Elections Clause out of concern "a State would refuse to provide for the election of representatives to the Federal Congress." (citing THE FEDERALIST NO. 59, pp. 362-363 (C. Rossiter

---

[10]     Unlike voting, there is a federal mailbox statute applicable to filings under the internal revenue laws. *See* 26 U.S.C. § 7502. Because there was no common law right to proxy voting and absentee voting was yet to be invented, the common law's mailbox rule for contracts would not have applied to voting.

[11]     *See Lynch*, *supra* note 6.

ed. 1961) (A. Hamilton))).  This first led to a 1792 act wherein Congress provided a deadline, rather than a designated day, by which states must appoint electors.[12]  Act of March 1, 1792, Sess. I, Ch. 8; and Stonecash, *et al.*, at 140-41.  But further legislation was needed to resolve issues arising from the nation's diverse state electoral calendars, including voter fraud fears.  *Id.*  This prompted Congress to establish a National Day of Election for the appointment of presidential electors in 1845.[13]  *Id.* at 142; 3 U.S.C. § 1.  Within three years, all states had adopted the national Election Day for presidential elections.  *Id.* at 141.

While Congress sought to create a more uniform national election calendar, new state electoral practices emerged, none of which facilitated ballots to be received after Election Day.  In the 18th and early part of the 19th century, some states began adopting paper ballots, which quickly became the majority practice.  E. Evans, A HISTORY OF THE AUSTRALIAN BALLOT SYSTEM IN THE UNITED STATES, 11 (1917) (Evans); *Burson*, 504 U.S. at 200.  This practice generally involved voters' handwriting their votes on personal paper, which they delivered to polling places on Election Day.  *Id.* at 200.  These "ballots" were only cast once marked and deposited in the ballot box or otherwise delivered to election officials on Election Day.  *Id.*

*Viva voce* and handwritten ballots remained the majority practices until one voter crafted his own preprinted "ticket" ballot in 1829.  Evans at 11-12.  Ticket voting grew in popularity immediately as newspapers, political parties, unions, and other private groups printed tickets with advertisements or political messages.  *Id.* at 12; and *Burson*, 504 U.S. at 201-03.  Many states

---

[12]     This was Congress' first federal election regulation.  Stonecash*, et al.*, at 140-41.  Save Election Day regulations, Congress used its election powers very rarely until after the Civil War. *See* James H. Lewis and Albert H. Putney, HANDBOOK ON ELECTION LAWS, 239 (1912), available at https://bit.ly/3cceuvC.

[13]     By establishing a uniform date, Congress sought "to remedy more than one evil arising from the election of members of congress occurring at different times in the different states."  *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884).

abandoned *viva voce* voting as tickets grew in popularity.[14]  *See also* Donald A. Debats, How America Voted: By Voice, 5, Univ. of Virg. Inst. For Advanced Tech. in Humanities, (2016), available at https://bit.ly/3sVOMRu.  Like handwritten ballots, tickets were simply privately created paper of no legal consequence until deposited into a ballot box by a voter on Election Day.[15]  *See Maddox*, 149 P.2d at 115.  Following "the 1888 presidential election, which was widely regarded as having been plagued by fraud, many States moved to the Australian ballot system." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 356 (1997); *see also* J. Harris, Election Administration in the United States, 153-54 (1934), available at https://bit.ly/3cdio7z.  By 1896, almost 90 percent of States had adopted it.  *Burson*, 504 U.S. at 203-205.

3. Even During the Civil War Absentee Ballots Were Not Cast Until Received by State Officials on Election Day.

There have been two waves of absentee voting adoption.  The advent of absentee voting first arose in response to the Civil War.  Josiah Henry Benton, Voting in the Field, 4-5 (1915), available at https://bit.ly/3p4OQaq.  Prior to 1861, all states required that voting was exercised by casting ballots in person in their election districts.[16]  *See id.*  After war broke out, there was an effort to ensure soldiers could still exercise their franchise.  *Id.* at 4-14.  Thus, between 1861-64 several states adopted one of two absentee voting methods to allow "voting in the field," both of which involved ballots being received by state election officials on Election Day.  *Id.* at 4, 15. Some states, including Illinois, enacted proxy voting whereby a soldier would mail his marked ballot to someone back home to deliver at his home precinct on Election Day.  *Id.* at 15, 265.

---

14    Arkansas (1846), Missouri (1863), Virginia (1867), and Kentucky (1890) were the last states to abandon v*iva voce*.  Evans, at 17.

15    *But see Bloome*, *supra*, note 5.

16    Technically, Pennsylvania had the first absentee law dating back to 1813.  *See* Benton at 189-203.  But it was later struck down by the Pennsylvania Supreme Court.  *Id.*

"Under this method it was claimed that the voter's connection with his ballot did not end until it was cast into the box at the home precinct, and therefore that the soldier really did vote, not in the field, but in his precinct." *Id.* at 15.

Under the second method, states actually created poll sites within military units by providing them ballot boxes and appointing servicemen as state election officials to receive ballots on Election Day. *Id.* at 15-17; *see also id.* at 43 (describing Missouri's field voting practices). After field ballots were received by the appointed officials, the ballots would be counted in the field or sent back the servicemen's home states. *Id.* at 317.

Absentee voting disappeared after the Civil War, *id.* at 314, but reemerged in the early 20th century as a result of changing economics and war.[17]  Charles Kettleborough, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 11, No. 2, 320-322 (May 1917), available at https://bit.ly/3z14deH; and *see also* John C. Fortier, ABSENTEE AND EARLY VOTING: TRENDS, PROMISES, AND PERILS, AEI Press, at 8-11 (2006), available at https://bit.ly/3P3HaFD.  While these new practices took different forms, they adhered with the original public meaning that Election Day meant receipt day. *See generally* P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 2, 251-261 (May 1918) (describing different state absentee voting procedures, including Illinois) available at https://bit.ly/3PjmtVS.  For example, several states, including Illinois, required absentee voters to swear that they would return their ballots to election officials on or before Election Day. *Id.* at 255.  As another example, Washington state required absentee voters to appear at any state poll site on Election Day to absentee vote. *Id.* at 253.  "[T]he

---

[17]    Because 20th century absentee practices were enacted almost seven decades after Congress enacted Election Day, they are hardly "contemporaneous to the enactment" or explain the "development and evolution of the common-law definition" of Election Day.  *See generally*, *Sandifer*, 571 U.S. at 228.  To the extent these practices assist in determining the original public meaning, they reinforce Plaintiffs' view that Election Day meant receipt day.

act of voting is not completed until the ballot is deposited in the ballot-box." *Goodell v. Judith Basin Cty.*, 224 P. 1110, 1111-14 (1924) (collecting decisions on absentee statutes).

Similarly, early 20th century military absentee laws adopted many of the voting practices from the Civil War that reflected the original public meaning that Election Day meant receipt day. *See generally* P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 3, at 461-69 (Aug. 1918) (summarizing 20th century military absentee voting procedures), available at https://bit.ly/3auLHlv. These practices included proxy voting, express requirements ballots needed to be cast on or before Election Day, opening polling sites at a regiment's location, and deputizing service men to serve as state election officers to receive ballots. *Id.* at 464-68.

4. Until Very Recently, the Original Public Meaning of Election Day Was Nearly Universal

Prior to 2002, only a small number of jurisdictions had experimented with holding voting open after Election Day. A 1971 absentee voting study by the Department of Defense reported that 52 of 54 U.S. jurisdictions required ballot receipt on or before Election Day.[18] Washington and Nebraska were the lone outliers holding voting open for 15 and 1 day(s), respectively. Nebraska long ago abandoned this practice, and now requires Election Day receipt.[19] Neb. Rev. Stat. Ann. § 32-950. Washington state has probably experimented with this practice the longest, but as noted, *supra* II.A.3, its 1917 absentee statute required voters to appear at state poll sites to cast absentee ballots.[20]

_____

[18]   *See The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977), available at https://bit.ly/38z9zU9.
[19]   A 1933 treatise reported California held voting open for up to 15 days after Election Day. Harris at 291. Like Nebraska, however, California's experiment with holding voting open was short lived. As recently as 2015, California had required all ballots to be received by Election Day. Cal. Elec. Code § 3020 and 2014 Cal ALS 618, 2014 Cal SB 29, 2014 Cal Stats. ch. 618.
[20]   Even assuming it existed when Washington joined the union in 1889, this practice of allowing late ballots provides little guidance regarding the original public meaning statutes enacted

Washington notwithstanding, these experiments were generally short lived and involved a very small number of ballots. That is no longer the case. Whereas previously the universe of VBM ballots was *de minimis*, those ballots constituted 46% of total ballots cast in 2020, by far the primary means by which votes were cast in the United States.[21] As the instant complaint alleges, Defendants even warned the public to not rely on the uncertified results during the 2020 presidential election because late-arriving ballots could change the final results. Doc. 1, ¶ 19.

### III. Illinois' Receipt Deadline Burdens Plaintiffs' Right to Vote and Right to Stand for Office Under the First and Fourteenth Amendments and Violates 42 U.S.C. § 1983.

Plaintiffs are severely burdened by Illinois' Receipt Deadline holding voting open fourteen days after Election Day. As a current U.S. Representative and candidates in federal elections, Plaintiffs' rights to stand for office are substantially burdened by the Receipt Deadline's violation of 2 U.S.C. § 7 and 3 U.S.C. § 1. *See* Declaration of Michael J. Bost, Ex. 4 (hereinafter "Bost Decl."), ¶¶ 10-12; Declaration of Laura Pollastrini, Ex. 5 (hereinafter "Pollastrini Decl."), ¶¶ 10-22; and Declaration of Susan Sweeney, Ex. 6 (hereinafter "Sweeney Decl."), ¶¶ 9-17.[22] For example, Congressman Bost's campaigns now must allocate substantial resources (*e.g.*, campaign funds and staff/volunteer time) to monitor late-arriving VBM ballots during the additional fourteen

---

in 1845 and 1872. A "few late-in-time outliers" from territories do not provide much insight into historical meaning especially if it contradicts the overwhelming weight of other historical evidence. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 2022 U.S. LEXIS 3055, at *82-89 (June 23, 2022) (finding that one-off, localized firearm regulations affecting "miniscule territorial populations" do not outweigh more contemporaneous historical evidence).

[21] From 1920-30, absentee ballots were estimated to account for less than .5% of total votes. Harris at 293. In 2000, 10% of voters nationwide voted by mail. *See* Charles Stewart III, *How We Voted in 2020: A First Look at the Survey of the Performance of American Elections*, MIT Election Data + Science Lab, (Dec. 15, 2020), available at https://bit.ly/39WCp0H. That number doubled to 21% by 2016 before doubling yet again to 46% in 2020. VBM is now the predominant voting method over early voting and Election Day voting.

[22] All referenced exhibits are attached to the Statement of Material Fact filed in support of the Motion for Partial Summary Judgment.

days that Illinois holds voting open. Bost Decl., ¶¶11-18. Before Illinois extended the Receipt Deadline, his campaigns did not incur such a burden. *Id.*, ¶¶ 10-13. Now, his campaign needs to allocate hundreds of hours of volunteer or campaign staff time, in at least 34 different locations, to observe during the fourteen days voting is held open under Illinois' Receipt Deadline. *Id.*, ¶¶ 15-18. Plaintiffs Pollastrini and Sweeney experienced similar problems during their campaigns as nominees for presidential and vice-presidential electors in the Electoral College. Pollastrini Decl., ¶¶ 12-14 and Sweeney Decl., ¶¶ 12-14.

Likewise, Plaintiffs' lawful votes within the prescribed federal statutory period are diluted by unlawful votes received after Election Day. Bost Decl., ¶ 25; Pollastrini Decl., ¶ 18, and Sweeney Decl., ¶ 17. None of these burdens are outweighed by any state interest, as Illinois cannot claim an interest in administering a law that is superseded and preempted by federal law.

First and Fourteenth Amendment challenges to state election laws are often governed by the two-part test outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) (hereinafter "*Anderson-Burdick*").[23] Under that test, courts must "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (citation omitted). Second, the court "must identify and evaluate the precise interests put forward by the State as justifications for the burden

---

[23] It is not clear the Court needs to apply the full *Anderson-Burdick* analysis in this case. Circuits have sometimes applied *Anderson-Burdick* to challenges to state election law affecting Election Day, *see e.g.*, *See Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1186-1187, 1195 (9th Cir. 2021), but other circuits have declined to do so in Election Day disputes. *See Keisling*, 259 F.3d at 1175-76; *Bomer*, 199 F.3d at 775-77; *Millsaps*, 259 F.3d at 543-46. In *Foster*, the most analogous case, the Supreme Court ignored the *Anderson-Burdick* test and struck down Louisiana's election regime, declaring that it violated federal Election Day statutes. The plaintiffs in *Foster* were four Louisiana voters. *Love v. Foster*, 90 F.3d 1026, 1027 (5th Cir. 1996).

imposed by its rule and weigh these interests against the burdened rights." *Id.* (internal quotation marks and citation omitted). In analyzing this second prong, courts look to the "legitimacy and strength of the proffered interests, as well as 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson*, 460 U.S. at 789).

The more severe the burden on constitutional rights, "the more rigorous the inquiry into its justifications." *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 523-24 (7th Cir. 2017) (citation omitted). "Nondiscriminatory restrictions that impose only slight burdens are generally justified by the need for orderly and fair elections," while severe burdens are unconstitutional unless they are "narrowly tailored to serve a compelling state interest." *Id.* at 524 (citations omitted).

Here, the magnitude of the burden on Plaintiffs is severe. Congressman Bost, who has been a candidate and representative for both state and federal office since 1994, has had to spend substantial amounts of money and time organizing, funding, and running his campaigns in order to monitor and respond as needed to ballots received by state officials after the federally prescribed Election Day. *See* Bost Decl., ¶¶ 7-19 This burden is magnified by the fact that late arriving ballots often are not completed properly, are missing signatures or dates, or have other material deficiencies. *Id.*, ¶¶ 15-18. Plaintiff Bost's campaign needs to both monitor and evaluate whether to object to the counting of deficient ballots, which costs time and money that would otherwise would not have to be spent if Illinois complied with the Election Day deadline. *Id.* This is especially burdensome in the 12th District, which includes 34 counties, in whole or part. *Id.*, ¶¶ 5 and 17. Congressman Bost intends to have poll watchers at every courthouse in the 12th District, meaning his campaign may have to expend hundreds of hours of staff and volunteer time during the fourteen days after Election Day.

Other burdens on the Plaintiffs are also severe. Plaintiffs organize volunteers across numerous counties to monitor Election Day activities and ballot arrivals. *Id.*; Pollastrini Decl., ¶¶ 10-13; and Sweeney Decl., ¶¶ 9-12. That work is substantially more burdensome as a result of Illinois' Receipt Deadline. Bost Decl., ¶¶ 8-21; Pollastrini Decl., ¶¶ 10-13 and Sweeney Decl., ¶ 9. This burden is captured by a recent political cartoon depicting Election Day as extending for several weeks after the designated day. Doc. 1, ¶ 24. Plaintiffs are concerned about election fraud. They are especially concerned that extending Election Day for multiple weeks allows bad actors to better target and affect close elections, undermining Plaintiffs' confidence in the integrity of Illinois' election results. Bost Decl., ¶ 26; Pollastrini Decl., ¶ 23; and Sweeney Decl., ¶ 18. This was such a concern that during the 19th century some states required that all ballots must be counted by Election Day night in order to reduce the risk of such fraud. McCrary at 493.

Any interest that Illinois might assert in holding voting open for fourteen days after Election Day cannot outweigh the severe burdens outlined above by Plaintiffs. Illinois joined the union in 1818. By all accounts, from then until 2005, Illinois required that absentee ballots needed to be received by election officials on or before Election Day. Even during the middle of the civil war, the procedures adopted by the Illinois General Assembly required that ballots be received on or before Election Day. *See* Benton at 13 and 250-65. Thus, whatever interest that Illinois might now assert must have arisen around the time of the 2005 amendment to its Receipt Deadline. While the state may assert that its interest is to promote convenience or ballot access, those interests are not narrowly tailored and can be served by other means that do not infringe upon Plaintiffs' constitutional rights and federal law—by allowing, for example, more early voting.

But even taking such interest at face value, it would still fail under the *Anderson-Burdick* framework, because a state cannot assert an interest, much less a compelling one, where that

interest itself infringes upon or is superseded by federal Time regulation.[24]  Supremacy Clause, U.S. Const. art. VI, cl. 2; *see Hobbs*, 18 F.4th at 1192 (rejecting plaintiff voters' attempt to extend the federally prescribed Election Day in order to cure absentee ballots without signatures since a "voter cannot legally submit new votes after election day."); *Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) (finding the state lacked an interest in enforcing the documentary proof of citizenship requirement because the state law was preempted by the federal National Voter Registration Act).

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion for partial summary judgment on Counts I and II with respect to the November 8, 2022 Congressional elections.

July 15, 2022

_____*s/ Russ Nobile*_____
T. Russell Nobile
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
rnobile@judicialwatch.org

Christine Svenson, Esq.
(IL Bar No. 6230370)
SVENSON LAW OFFICES
345 N. Eric Drive
Palatine IL 60067
T: 312.467.2900
christine@svensonlawoffices.com

Paul J. Orfanedes (IL Bar No. 6205255)
Robert D. Popper*
Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
porfanedes@judicialwatch.org
rpopper@judicialwatch.org
elee@judicialwatch.org

*  *Application for admission pro hac vice forthcoming*

---

[24]     State powers under the Elections and Electors Clauses are delegated, not reserved.  *See Cook*, *supra*, note 2.