IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL J. BOST, et al., | | |
| Plaintiffs, | | Civil Action No. 1:22-cv-02754 |
| v. | | |
| | | Judge John F. Kness |
| THE ILLINOIS STATE BOARD OF ELECTIONS, et al., | | |
| Defendants. | | |

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Contents ................................................................................................ ii

Table of Authorities ........................................................................................... iii

Introduction ........................................................................................................1

Legal Standard ...................................................................................................2

<u>Argument</u>

    I.  Plaintiffs Have Standing Under Article III Based on
       Injuries Incurred as Voters and Candidates .............................................3

    II.  This Court Previously Rejected Defendants' Sovereign
       Immunity Arguments .................................................................................12

    III.  Plaintiffs Alleged Plausible Violations of 2 U.S.C. § 7 and 3 U.S.C. § 1 ...........14

    IV.  Plaintiffs Pled Sufficient Facts to Show Unconstitutional Burdens
       in Violation of the First and Fourteenth Amendments .........................18

        a.  Under *Foster*, the *Anderson-Burdick* Test Does
          Not Apply to Plaintiffs' Claims ......................................................18

        b.  Even If the *Anderson-Burdick* Test Applies, Plaintiffs Have Pled
          Sufficient Facts to Show Illinois' Receipt Deadline Impermissibly
          Burdens Their First and Fourteenth Amendment Rights ..............19

Conclusion .........................................................................................................24

## TABLE OF AUTHORITIES

**Cases**                                                     **Page**

*Alvarez v. Smith*, 558 U.S. 87 (2009) .................................................................4

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................ *passim*

*Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021) .........................23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................3

*Baker v. Carr,* 369 U.S. 186 (1962) ....................................................................7

*Bell v. Hood*, 327 U.S. 678 (1946) ......................................................................3

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................3

*Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) ...............................................10

*Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020) .......................................9,10

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009) .....................................................5

*Burdick v. Takushi*, 504 U.S. 428 (1992) ...................................................... *passim*

*Bush v. Gore*, 531 U.S. 98 (2000) ..................................................................7,10

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) ...........................................9, 20

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) ..........................19, 21

*Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) ........7

*Dep't of Homeland Security v. New York*, 140 S. Ct. 599 (2020) ......................17

*Donald J. Trump for President v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020) ..............9

*Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020) ........ *passim*

*Donald J. Trump for President, Inc. v. Way*, No. 20-10753 (MAS) (ZNQ),
2020 U.S. Dist. LEXIS 196911 (D.N.J. Oct. 22, 2020) ......................................9

*Early v. Bankers Life & Cas. Co.*, 959 F.2d 75 (7th Cir. 1992) ............................2

*Ex parte Siebold*, 100 U.S. 371 (1880) ........................................................19, 22

*Ex parte Yarbrough*, 110 U.S. 651 (1884)..........................................................................22

*Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596 (E.D. Wis. 2020) ................. *passim*

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) ...............................................................23

*Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696 (7th Cir. 2014) ................3

*Foster v. Love*, 522 U.S. 67 (1997)............................................................................ *passim*

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)........................................................................6, 7

*Gould v. Schneider*, 448 Fed. Appx. 615 (7th Cir. 2011) ......................................................8

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004)...............................................................22

*Hotze v. Hudspeth*, 16 F.4th 1121 (5th Cir. 2021)...............................................................10

*Hrubec v. Amtrak*, 981 F.2d 962 (7th Cir. 1992)..................................................................2

*Ill. Conservative Union v. Illinois*, 2021 U.S. Dist. LEXIS 102543
    (N.D. Ill. June 1, 2021) ...........................................................................................23

*Ill. Conservative Union et al. v. Illinois et al.*, (1:20-cv-05542) ECF 29
    (N.D. Ill. Sept. 28, 2021) .........................................................................................12

*Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173 (1979)................................21

*In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*,
    155 F. Supp. 3d 772 (N.D. Ill. 2016) .........................................................................3

*Judge v. Quinn*, 623 F. Supp. 2d 933 (N.D. Ill. 2009)..........................................................6

*Judicial Watch v. King*, 993 F. Supp. 2d 919 (S.D. Ind. 2012) ....................................20, 21

*King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020) ...............................................9, 12

*Lance v. Coffman*, 549 U.S. 437 (2007) ...........................................................................11

*Lance v. Dennis*, 546 U.S. 459 (2006) ..............................................................................11

*Libertarian Party of Ind. v. Marion Cnty. Bd. of*
    *Voter Registration*, 778 F. Supp. 1458 (S.D. Ind. 1991) .........................................20, 21

*Libertarian Party of Illinois v. Scholz*, 872 F.3d 518 (7th Cir. 2017) .................................21

*Long v. Shorebank Dev. Corp.*, 182 F.3d 548 (7th Cir. 1999)................................................2

*Love v. Foster*, 90 F.3d 1026 (5th Cir. 1996) ...................................................................2

*Malak v. Associated Physicians, Inc.*, 784 F.2d 277 (7th Cir. 1986)....................................3

*McPherson v. Blacker*, 146 U.S. 1 (1892) .......................................................................10

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) ..........................................................4

*Moore v. Ogilvie*, 394 U.S. 814 (1969).............................................................................10

*Motel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694 (N.D. Ill. 2014) ...............................2

*Mungiovi v. Chicago Hous. Auth.*, 901 F. Supp. 261 (N.D. Ill. 1995) .....................................3

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986)......................................................21

*Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004) ....................................................................21

*Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253 (D. Utah 2015)........................................23

*Nelson v. Warner,* 472 F. Supp. 3d 297 (S.D. W. Va. 2020).................................................9

*N.Y. State Bd. Of Elections v. Lopez Torres*, 552 U.S. 196 (2008).....................................10

*Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020)...............................................9

*PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244 (2021) ...........................13, 14

*Public Interest Legal Found. v. Matthews*, No. 20-3190,
    2022 U.S. Dist. LEXIS 40640 (C.D. Ill. March 8, 2022) .................................................12

*Principality of Monaco v. Mississippi*, 292 U.S. 313 (1934)...............................................13

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .......................................................................7, 18

*Rep. Party v. Boockvar*, 141 S. Ct. 1 (2020).................................................................10

*Rep. Party v. Degraffenreid*, 141 S. Ct. 732 (2021) ......................................................10

*Reynolds v. Sims*, 377 U.S. 533 (1964)......................................................................7, 20

*Smiley v. Holm*, 285 U.S. 355 (1932) ..........................................................................4

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...............................................................4, 9

*Storer v. Brown*, 415 U.S. 724 (1974) ............................................................5

*Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020) .............................................18

*United States v. Richardson*, 418 U.S. 166 (1974) ........................................11

*United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775 (7th Cir. 2016) ....................2

*U.S. v. Saylor*, 322 U.S. 385 (1944)...............................................................20

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995)......................................13

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000)...........................4, 15

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001) ............................4

*Wesberry v. Sanders*, 376 U.S. 1 (1964)........................................................20

*Williams v. Rhodes*, 393 U.S. 23 (1968) .........................................................5

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1 ("Elections Clause")......................................... *passim*

U.S. Const. art. II, § 1, cl. 2 ("Electors Clause") ........................................ *passim*

U.S. Const. amend. X.....................................................................................13

U.S. Const. amend. XI ...................................................................................14

## Statutes

2 U.S.C. § 1..................................................................................................15

2 U.S.C. § 7.......................................................................................... *passim*

3 U.S.C. § 1.......................................................................................... *passim*

42 U.S.C. § 1983.................................................................................. *passim*

10 ILCS 5/19-8(c) ("Receipt Deadline") ............................................. *passim*

## Federal Rules

Fed. R. Civ. P. 8 (a) ......................................................................................5

Fed. R. Civ. P. 12(b)(1) ........................................................................................2, 3

Fed. R. Civ. P. 12(b)(6) ...........................................................................................3

## **Other Authorities**

Cong. Globe, 42 Cong., 2d Sess. 618 (1872) ..........................................................5

George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS,
(Henry L. McCune eds. 4th ed. 1897) ............................................................10

H. Rep. 103-9 ........................................................................................................13

J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES (1934) ..................10

S. Rep. 103-6 ........................................................................................................13

Tbl. 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf.
of State Legis. (July 12, 2022) .........................................................................2

THE FEDERALIST NO. 81 (C. Rossiter ed. 1961) (A. Hamilton) ...........................13

Plaintiffs Michael J. Bost, Laura Pollastrini, and Susan Sweeney ("Plaintiffs"), through counsel, submit this opposition to Defendants' Motion to Dismiss. ECF 25 and 26.

## **INTRODUCTION**

"[T]he combined actions of voters and officials meant to make a final selection of an officeholder" cannot occur before national Election Day. *Foster v. Love*, 522 U.S. 67, 71 (1997). Nor can these combined actions occur *after* Election Day, which is what Section 10 ILCS 5/19-8(c) ("Receipt Deadline") does by holding voting open fourteen days after the uniform federal Election Day. Plaintiffs' claims here are the natural analog to *Foster*: voting can no more end fourteen days after Election Day than it can fourteen days before.

Three Illinois voters all of whom have been and will be candidates in federal elections, including a member of the United States House of Representatives, filed this suit seeking an order from this Court limiting further injuries to their First and Fourteenth Amendment and statutory rights. Like *Foster*, Plaintiffs filed suit under 42 U.S.C. § 1983. Plaintiffs recently filed a Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment detailing how the text, structure, history, and precedent regarding "Election Day" support their view that the ordinary plain meaning of "Election" and "Election Day" means "Receipt Day." ECF 33. "[T]he combined actions of voters and officials meant to make a final selection of an officeholder" occurs upon ballot receipt. *Id.* at 10-22; *see generally Foster*, 522 U.S. at 71.

Defendants moved to dismiss this suit and contend that if the Court grants Plaintiffs' relief "millions of Illinoisians" may be disenfranchised. ECF 25; ECF 26 at 6. Plaintiffs, of course, do not seek to disenfranchise *anyone* and no one will be disenfranchised if Plaintiffs prevail. Any legitimate concerns about accidental disenfranchisement can easily by solved a myriad of ways that comply with 2 U.S.C. § 7 and 3 U.S.C. § 1. Since 1845, Election Day has meant receipt day

and even Defendants acknowledge it remains the majority practice.[1] Surely Defendants do not contend that sister states such as Delaware, Michigan, and Vermont, which all require ballots to be received by Election Day, are currently disenfranchising their voters. Illinois held approximately 40 presidential elections during the period between the enactment of 3 U.S.C. § 1 and the General Assembly's decision to hold voting open 14 days Election Day. Do Defendants contend that Illinois disenfranchised voters during those 40 presidential elections? Were voters disenfranchised during the Colonial, Early Republic, Civil War, Reconstruction, and 20th Century eras when states universally required ballot receipt on or before Election Day? Defendants' appeal to emotion falls flat as do their exaggerated disenfranchisement claims, which are easily refuted.

## LEGAL STANDARD

A Rule 12(b)(1) motion "asks the court to dismiss an action over which it allegedly lacks subject matter jurisdiction." *Motel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 705 (N.D. Ill. 2014). Though the "burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction," "[a]ll reasonable inferences are drawn in favor of the plaintiff, and all well-pleaded allegations are accepted as true." *Id.* (citing *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)). Plaintiffs "may point to facts in a brief or affidavit 'in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle [the plaintiff] to judgment.'" *U.S. ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (citing *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992)); *see also Hrubec v. Amtrak*, 981 F.2d 962, 963-964 (7th Cir. 1992) (holding a plaintiff may add essential facts on a motion to dismiss "by affidavit or brief").

---

[1]     *See* ECF 26 at 6; and *see also* Tbl. 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf. of State Legis. (July 12, 2022), available at https://bit.ly/3vRBB5G.

A further consideration applies where, as here, a Rule 12(b)(1) motion relies on what is basically an argument on the merits. "[W]here a challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action … jurisdiction cannot be defeated by the possibility that plaintiff may not have stated a cause of action." *Malak v. Associated Physicians*, Inc., 784 F.2d 277, 279 (7th Cir. 1986) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Unless a claim is "clearly … immaterial," made solely to obtain jurisdiction or "wholly insubstantial and frivolous," the district court "should take jurisdiction and handle defendants' motion as a direct attack on the merits." *Id.* at 279-80 (citing, *inter alia*, *Bell*, 327 U.S. at 682-83) (internal quotations omitted)); accord, *Mungiovi v. Chicago Hous. Auth.*, 901 F. Supp. 261, 263-64 (N.D. Ill. 1995).

A complaint survives a Rule 12(b)(6) motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. A district court must construe the complaint "in the light most favorable to the plaintiffs, accepting as true all well pleaded facts alleged and drawing all permissible inferences in their favor." *In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 782 (N.D. Ill. 2016) (quoting *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014)).

## I.  Plaintiffs Have Standing Under Article III Based on Injuries Incurred as Voters and Candidates.

Defendants argue that Plaintiffs lack "a concrete or particularized injury in fact" and fail to "state claims that are redressable by this Court[.]" Fed. R. Civ. P. 12(b)(1); and ECF 26 at 8-15. Defendants' standing argument cites numerous cases, but it cannot be squared ultimately with controlling Supreme Court precedent that long ago found that courts had jurisdiction to hear a

similar § 1983 suit brought by voters. *Foster*, 522 U.S. at 71. Adopting Defendants' arguments here would mean that the Supreme Court's guiding decision in *Foster*, as well as rulings by the Fifth, Sixth, and Ninth Circuits, were disputes "abstracted from any concrete actual or threatened harm."[2] *Alvarez v. Smith*, 558 U.S. 87, 93 (2009) (citations omitted). Plaintiffs are injured both as voters and candidates and those injuries are personal and concrete. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016).

The federal judiciary's consistent adjudication of such suits under § 1983 confirms that state laws that conflict with federal Time regulations endanger the fundamental right to vote—an injury that is judicially cognizable. Federal laws establishing a uniform Election Day are "safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). As Plaintiffs previously set forth, it is simply not the case that laws holding voting open after Election Day "enhance[], rather than burden[], the right to vote." ECF 26 at 19. Defendants' "enhancement-only" reasoning is not just refuted by the text, structure, and history of these federal statutes, but also by controlling precedents interpreting the same. Indeed, such laws are key congressionally mandated safeguards of the right to vote. As the Supreme Court and Ninth Circuit have recognized, Congress enacted national Election Day during Reconstruction to address the well-known disenfranchisement, hardship on voters, and fraud that was caused by the practice of multi-day voting. *See Foster*, 522 U.S. at 73-74; *Keisling*, 259 F.3d at 1174 ("Whenever you provide that elections shall take place upon the same day, you

---

[2]     The Ninth, Sixth, and Fifth Circuits all exercised jurisdiction and reached the merits in § 1983 suits brought by voters and advocacy groups challenging early voting statutes under *Foster*. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169, 1176 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d. 535, 549 (6th Cir. 2001); and *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773, 776-777 (5th Cir. 2000). The lower court rulings relied on by Defendants have not changed the longstanding authority on this question.

do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." (quoting Cong. Globe, 42 Cong., 2d Sess. 618 (1872))). It is thus not surprising that a unanimous Supreme Court assumed voters in *Foster* could challenge state laws violating federal Election Day statutes because those provisions have *always* been understood as congressional protections for the fundamental right to vote.

Plaintiffs' claims here mirror those in *Foster*.[3] Plaintiffs allege injuries to their First and Fourteenth Amendment rights and their statutory rights as voters and candidates.[4] ECF 1 at ¶¶ 29-48.[5] Plaintiffs contend that holding voting open fourteen days after Election Day results in the counting of untimely votes that are received in violation of federal law. *Id.* ¶ 34. Those unlawful votes substantially increase the pool of total votes cast and dilute the weight of Plaintiffs' votes in their districts. *Id*. More votes will be counted than the law allows to be counted, resulting in dilution. *Id*. This is because ballots are not votes until received (*i.e.*, consummated) and ballot receipt must occur in accordance with the Time regulations set forth by Congress. *See* ECF 33 at 10-13 (discussing the process by which a ballot transforms into a vote).

---

[3]     To the extent the instant case differs, the additional injuries alleged by Plaintiffs, all either former, current, or future candidates, exceed the Art. III injuries at issue in *Foster*.

[4]     The right to vote derives, among other things, from the right of association that is at the core of the First Amendment. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Williams v. Rhodes*, 393 U.S. 23, 38 (1968); and *see also Storer v. Brown*, 415 U.S. 724, 756 (1974) (Brennan, J., dissenting).

[5]     Plaintiffs' claim for relief must contain a short and plain statement of the claim showing that he or she is entitled to relief. *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (citing Fed. R. Civ. P. 8 (a)). This "[r]ule reflects a liberal notice pleading regime that is intended to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Id.* (citations and quotation marks omitted).

Sworn declarations filed in Plaintiffs' Motion for Partial Summary Judgment provide additional details regarding Plaintiffs' injuries, all of which are directly traceable to the fourteen additional days of voting. *See* ECF 31-4 ¶¶ 3-27; ECF 31-5 ¶¶ 4-24; and ECF 31-6 ¶¶ 10-19; *see also Gill v. Whitford*, 138 S. Ct. 1916, 1938 (2018) (Kagan, J., concurring) (explaining other First Amendment injuries that may occur as a result of vote dilution). Plaintiffs' declarations detail their particular volunteer efforts in their congressional districts. ECF 31-4 ¶¶ 11-20; ECF 31-5 ¶¶ 6-14, 17; and ECF 31-6 ¶¶ 5-11. Likewise, Plaintiffs explain the significant increase in resources needed to organize Election Day activities, both as candidates and voter volunteers, and that since Illinois extended voting, resource demands have materially increased just to maintain the same level of Election Day operations. ECF 31-4 ¶¶ 11-20; ECF 31-5 ¶¶ 6-14, 16-22; and ECF 31-6 ¶¶ 5-11. For example, due to the drastic increase in the volume of vote-by-mail ("VBM") ballots, the absolute number of potentially deficient ballots has materially increased, draining already limited financial and volunteer resources. ECF 31-4 ¶¶ 11-20; ECF 31-5 ¶¶ 6-14, 16-22; and ECF 31-6 ¶¶ 5-11. The voter injuries here are consistent with the injuries that led this Court in 2009 to find that different voters had standing to challenge a special election date chosen to fill the Senate seat vacated by then-President-elect Obama. *Judge v. Quinn*, 623 F. Supp. 2d 933, 934 n.3 (N.D. Ill. 2009) (agreeing with state defendants that plaintiff voters had standing), *aff'd*, 612 F.3d 537, 545-46 (7th Cir. 2010).

Holding voting open fourteen days after Election Day allows late ballots to be cast, which dilutes the votes of Plaintiffs. Defendants seemingly contend that vote dilution is not a cognizable injury in fact outside very narrow circumstances.[6] That is ultimately a merits question, because

---

[6] Defendants' argument that Plaintiffs "cannot state a claim for disenfranchisement through vote dilution" outside of "certain contexts" like malapportionment, surely goes too far. ECF No. 26 at 22. Dilution is an intuitive injury that applies when invalid ballots are *actually* cast and

vote dilution is indisputably an injury in fact: The "right to vote is 'individual and personal in nature.'" *Gill*, 138 S. Ct. at 1929 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)). And the "'right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds*, 377 U.S. at 555); *Reynolds*, 377 U.S. at 555 n.29 ("[T]he right to have the vote counted" means counted "at full value without dilution or discount." (quotation marks omitted)). *See also Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999); *Gill*, 138 S. Ct. at 1929-30; *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curiam).

Defendants do not contest that a ballot cast after Election Day is inherently dilutive. Rather, Defendants argue that Plaintiffs' injuries are "wholly speculative." ECF 26 at 13-14. Defendants contend that Plaintiffs needed to allege that "vote-by-mail ballots received after Election Day would swing the election in favor of their candidate's opponent" and the absence of such allegation warrants dismissal. *Id.* First, Plaintiffs disagree that such allegation is required. Second, Defendants have conceded this point. As alleged in the complaint, Defendants themselves warned that the November 2020 general election could swing in favor of a candidate's opponent as "close races may see leads change" due to "mail ballots arriv[ing] … after Nov. 3." *Id.* at ¶¶ 19-22 (citing

---

counted. The more that are cast, the greater the injury. Consider, by way of example, a hypothetical case where Illinois granted citizens of France the right to vote in its federal elections. Suppose Illinois flatly conceded that this violates federal law, but suppose further that its executive officials vowed to receive and count such ballots. The only real injury to private citizens would be dilution of their votes by virtue of unlawful ballots—the same injury claimed here. By Defendants' reasoning, however, no private citizen would have standing to challenge the French ballots in the hypothetical—or the hundreds of thousands of late ballots concededly cast here.

Defendants' statements and estimating from these statements that late ballots accounted for as much as 266,417 or 4.4% of all ballots counted in 2020). Congressman Bost put a finer point on this question when he confirmed that his election results often include late arriving ballots. ECF 31-4 at ¶¶ 9-12 and 21. Certainly his injury is not a "general grievance" or speculative in light of Defendants' public statements. Defendants have neither retracted nor corrected these public statements. This is materially different than the 2020 cases relied on by Defendants.[7] Accordingly, Defendants' own statements and data show that Plaintiffs' injuries in 2022 or 2024 are concrete.

The entire discussion of Plaintiffs' injuries as voters is mooted in any case by considering their candidate-based injuries. Congressman Bost's injuries clearly are personal and concrete under Article III.[8] ECF 31-4 at ¶¶ 3-27. He explained that he has been a candidate for public office repeatedly since 1994, *id.* at ¶¶ 4-8, and that before Illinois started holding voting open fourteen days after Election Day his campaigns usually ended on Election Day. *Id.* at ¶ 11. Now that Illinois holds voting open after Election Day, he must organize, fundraise, and continue to run most of his campaign's Election Day operations fourteen additional days after Election Day. *Id.* at ¶¶ 12-20. He provided particularized examples of what these operations entail, including resources used. *Id.* He noted this injury has gotten progressively worse since 2005, especially after the 2013 adoption of VBM. *Id.* at ¶¶ 8-13. Following recent redistricting, his injury is especially pronounced now that the 12th Congressional District was expanded from twelve to now parts of *34* counties. *Id.* at ¶¶ 5-13. His longstanding practice is to monitor voting in all counties in his district. *Id.* at ¶¶ 11-17. This task has gotten monumentally more difficult now that voting is held open fourteen

---

[7]    Defendants have not asserted that the 2022 and 2024 elections will be conducted in a materially different way than the 2020 election or have fewer late ballots.

[8]    Allegations made in response to a motion to dismiss may be considered in assessing whether standing exists. *See Gould v. Schneider*, 448 Fed. Appx. 615, 618 (7th Cir. 2011).

additional days in those 34 counties.[9] There is no plausible argument that the additional hundreds

of hours of volunteer and staff time needed to assist Congressman Bost to maintain his

longstanding practices is not a personal and individual injury.[10] *See Robins*, 578 U.S. at 339-40.

For 2022, he is one of two candidates running to represent the 12th Congressional District and the

only incumbent. There is no reasonable argument that his injuries are a "generally available

grievance about government."[11] ECF 26 at 10-12.

Though *Foster* remains controlling precedent, Defendants' motion primarily relies on trial

court rulings from truncated proceedings involving emergency relief related to the highly

contentious 2020 election.[12] *See Feehan*, 506 F. Supp. 3d at 600 (describing the 2020 election and

related litigation as "emotional," "often divisive," "passionate and urgent," and arousing "strong,

deep feelings"). Many of those rulings were not appealed, presumably because of time constraints

caused by the impending election. *See, e.g., Donald J. Trump for President, Inc. v. Way*, No. 20-

10753(MAS)(ZNQ), 2020 U.S. Dist. LEXIS 196911 (D.N.J. Oct. 22, 2020) and *Cegavske*, 488 F.

Supp. 3d 993. Those that were appealed were later reversed. *Carson v. Simon*, 978 F.3d 1051,

---

[9]     Congressman Bost also described competitive injuries he suffers as a result of Illinois'
Receipt Deadline. ECF 31-4 at ¶ 27 (describing injuries from changes in his margin of victory and
his ability to measure public opinion about his effectiveness). *See Nelson v. Warner*, 472 F. Supp.
3d 297, 304-05 (S.D. W. Va. 2020) (collecting cases where candidates had an injury-in-fact under
the competitive standing theory).

[10]     Plaintiffs Pollastrani and Sweeney provided additional details regarding injuries they
suffered as presidential elector nominees. *See* ECF 31-5 ¶¶ 4-24; and ECF 31-6 ¶¶ 10-19.

[11]     Defendants have not cited a single authority from the Supreme Court or the Seventh Circuit
finding that candidates lack standing in cases involving elections in which they are running. As
discussed below, time after time, the Supreme Court has ruled on the merits of claims brought by
candidates. At a minimum, Defendants' standing arguments means the Supreme Court exercised
jurisdiction on numerous cases in which it lacked Article III jurisdiction. At worst, it calls into
question holdings in numerous bedrock precedents regarding federal elections.

[12]     *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020);
*Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020); *Bognet v. Sec'y
Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020); *Feehan v. Wis. Elections Comm'n*, 506 F.
Supp. 3d 596 (E.D. Wis. 2020); and *King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020).

1059 (8th Cir. 2020) (finding that plaintiff electors had standing to challenge ballot receipt deadline regulations). Others were vacated.[13] *See Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020), vacated and remanded with instructions to dismiss as moot sub nom. *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). To the extent any of these district court rulings are still good law, Plaintiffs respectfully submit they were wrongly decided, and that consideration should be given to the unusual context in which those cases arose.

Aside from those standing objections, there is a long history of candidate standing to bring their claims regarding federal elections. *See generally* George W. McCrary, A Treatise on the American Law of Elections, (Henry L. McCune eds. 4th ed. 1897); and J. Harris, Election Administration in the United States (1934). Indeed, these new attacks on candidate standing cannot be reconciled with settled, federal precedent. Prior to 2020, it was axiomatic that aggrieved candidates in federal elections had standing to bring a federal lawsuit in federal court to hear their federal claims regarding violations of federal law.[14] *See, e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 23-24 (1892); *Moore v. Ogilvie*, 394 U.S. 814 (1969); *Bush*, 531 U.S. 98; and *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008).

---

[13]     Defendants also cite *Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020), but that case involved claims brought by the Pennsylvania Democratic Party seeking an order extending ballot receipt deadlines to mitigate alleged violations of state law. A divided Supreme Court denied certiorari in that case. *See Rep. Party v. Degraffenreid*, 141 S. Ct. 732 (2021) (Thomas, J., dissenting) and *Rep. Party v. Boockvar*, 141 S. Ct. 1 (2020) (Alito, J., dissenting). The instant case does not involve questions of state law or remedial powers of courts.

[14]     In another 2020 case, the Fifth Circuit determined it lacked jurisdiction to hear a challenge to Harris County's drive-through voting practices. *Hotze v. Hudspeth*, 16 F.4th 1121 (5th Cir. 2021). The court noted plaintiffs "failed to meaningfully brief [candidate standing], therefore forfeit[ed] it." *Id.* at 1124. In a dissent, Judge Oldham explained that candidates have historically had standing to challenge election practices. *Id.* at 1125-27. He noted "the only non-vacated circuit authorities to confront [candidate standing] question have held that candidates *do* have standing to contest violations of election law." *Id.* at 1126 (citing *Carson*, 978 F.3d at 1058); *see also id.* ("[I]t's hard to imagine anyone who has a more particularized injury than the candidate has.").

Defendants rely extensively on *Feehan*, 506 F. Supp. 3d 596. *Feehan* was, to say the least, an unusual case, wherein a 2020 presidential elector filed a post-election lawsuit seeking the extraordinary remedy of overturning already-certified election results and declaring his preferred candidate the certified winner. *Id*. Plaintiffs respectfully submit the Court should decline to follow *Feehan* for several reasons. First, Governor Evers agued in *Feehan* there was no evidence of unlawful activity that could have changed the electoral outcome. *Id*. at 604. That is materially different than here, where Defendants' own public statements show that approximately 266,000 ballots were late in 2020 and concede that such ballots could change the outcome. ECF 1 at ¶¶19-22. While there were ample other grounds to dismiss *Feehan*, its standing analysis would have been materially different if Governor Evers conceded that enough disputed, unlawful, or fraudulent ballots actually had been cast to change the electoral outcomes.

Second, *Feehan* was an eight-day proceeding initiated 28-days after Election Day. While such truncated proceedings were necessary in that context, they hardly provided adequate opportunity for considered and full briefing. As a result, the *Feehan* court relied on 2020 trial court rulings discussed above, which, for similar reasons, were wrongly decided.

Defendants also cite to *Lance v. Coffman*, 549 U.S. 437, 442 (2007) and *United States v. Richardson*, 418 U.S. 166 (1974) in support of their "generalized grievance" argument. ECF 26 at 12. But Plaintiffs have not asserted "taxpayer standing." *Lance*, 549 U.S. at 440.[15] "The only injury plaintiffs allege is that the law – specifically the Elections Clause—has not been followed." *Lance*, 549 U.S. at 442. Plaintiffs here alleged dilution as well as other First and Fourteenth Amendment and statutory injuries as both voters and candidates. Congressman Bost detailed the additional

---

[15] Colorado's 2000 congressional redistricting was extensively litigated. *Lance* was a citizen suit filed after the conclusion of other proceedings. *Id.*; *see also* *Lance v. Dennis*, 546 U.S. 459 (2006).

expenses he has incurred as a result of Illinois' Receipt Deadline. That fact, together with Defendants' 2020 public statements that approximately 266,000 late ballots could change electoral outcomes, show the injuries alleged here go well beyond those raised in *Lance*.

Defendants further cite *Feehan* in their final standing argument, claiming a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." ECF No. 26 at 14 (quoting *Feehan*, 506 F. Supp. 3d at 610 (internal citation omitted)); *see id.* (quoting *King*, 505 F. Supp. 3d at 735 (the plaintiffs' injury "does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote.")). Again, Defendants simply ignore the stark contrast between remedies sought here and remedies sought in those cases. The *Feehan* plaintiffs sought to decertify the 2020 election results and have Donald Trump declared the winner of Wisconsin. 506 F. Supp. 3d at 600. Based on "claims of widespread voter irregularities and fraud," the plaintiffs in *King* sought a similar outcome in Michigan—relief "stunning in its scope and breathtaking in its reach," which would have "disenfranchise[d]" the "5.5 million Michigan citizens" who voted in 2020. 505 F. Supp. 3d at 25. None of this is true here. Plaintiffs do not seek to set any election aside or to reject any ballots already cast. And Plaintiffs only seek to enjoin the future counting of *unlawful* ballots— not *all* ballots cast in a past election. No one is "disenfranchised" if unlawful ballots received after Election Day are not counted.

## II.     This Court Previously Rejected Defendants' Sovereign Immunity Arguments

This Court and the Central District of Illinois have both rejected Defendants' sovereign immunity argument in cases involving federal regulations promulgated under Elections Clause. *Public Interest Legal Found. v. Matthews*, No. 20-3190, 2022 U.S. Dist. LEXIS 40640, at *12 (C.D. Ill. March 8, 2022) and *Ill. Conservative Union et al. v. Illinois et al.*, (1:20-cv-05542)(Sept.

12

28, 2021)(ECF 29). While those cases involved the National Voter Registration Act of 1993 ("NVRA"), Defendants' argument here fails for the same reasons: "States consented to suit for claims related to the time, place, and manner of federal elections[.]"[16] *Id.* at 3. In rejecting the Illinois State Board of Elections' argument, the Court relied on the "plan of the Convention" doctrine, which refers to "the structure of the original Constitution itself." *Id.* 2-3 and *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2259 (2021) (quotations and citation omitted); and *Public Interest Legal Found*, 2022 U.S. Dist. LEXIS 40640, at *12 (finding the Elections Clause "embodies the understanding between the States and the Federal Government at the Founding that the States' sovereign immunity would bend to the powers of the Federal Government over federal elections.").

"There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934) (quoting The Federalist No. 81). State responsibilities for federal elections arise from powers delegated by Congress, and not reserved to the states by the Constitution. *See U.S. Term Limits v. Thornton*, 514 U.S. 779, 800-05 (1995) (discussing delegated versus reserved electoral powers).[17] "Congressional abrogation is not the only means of subjecting

---

[16]    Congress enacted the NVRA, in part, pursuant to its powers under the Elections Clause. S. Rep. 103-6 at 3; and H.R. Rep. 103-9 at 3. Congress enacted 2 U.S.C. § 7 and 3 U.S.C. § 1 pursuant to the Elections and Electors Clauses, respectively.

[17]    The Supreme Court previously applied the "plan of the Convention" doctrine to Article I in the Tenth Amendment context. *See* 514 U.S. at 801-06. There it explained that as part of the plan of the Convention the Tenth Amendment drew a "basic distinction between the powers of the newly created Federal Government and the powers retained by the pre-existing sovereign States." *Id.* at 801. "[S]tates can exercise no powers whatsoever, which exclusively spring out of the existence of the national government." *Id.* at 802 (citations and quotations omitted). Thus, "in certain limited contexts, the power to regulate the incidents of the federal system is not a reserved power of the States, but rather is delegated by the Constitution." *Id.* at 805. "In short, as the Framers

States to suit [under Article I]." *PennEast*, 141 S. Ct. at 2259 (bracketed language added). The "plan of the Convention" doctrine recognizes that there are "certain waivers of sovereign immunity to which all states implicitly consented at the founding." *Id.* at 2258 (citation omitted). "States can also be sued if they have consented to suit in the plan of the Convention." *Id.* at 2259. "[W]here the States agreed in the plan of the Convention not to assert any sovereign immunity defense, no congressional abrogation [is] needed." *Id.* (citations and quotations omitted).

States agreed in adopting the Elections Clause to grant the federal government the authority over federal elections and, thus, there was no sovereign immunity to preserve under the Eleventh Amendment because colonies did not have reserved power related to federal elections for a yet-to-be-established national government.

### III.    Plaintiffs Alleged Plausible Violations of 2 U.S.C. § 7 and 3 U.S.C. § 1.

Plaintiffs alleged sufficient facts to plausibly show that Illinois' Receipt Deadline violates federal law. Plaintiffs alleged Defendants had received a significant number of VBM ballots well after Election Day on November 3, 2020, and these late arriving VBM ballots from November 3, 2020 to November 17, 2020 "could materially affect the unofficial election results." ECF 1 at ¶¶ 19-22. Many of these allegations are taken directly from Defendants' own public statements. *Id.* The Complaint described how Defendants would count such VBM ballots received up until November 17, 2020, even if those ballots lacked any identifying postmark indicating they were sent on Election Day. *Id.* at ¶ 18. In other words, the facts alleged plausibly show that Defendants, by reason of the Illinois law, could not "consummate" the voting on Election Day by Congress'

---

recognized, electing representatives to the National Legislature was a new right, arising from the Constitution itself." *Id.*

proscribed date. Plaintiffs alleged the same will recur during the 2022 and 2024 federal elections. *Id*. at ¶¶ 25-28.

Relying on two cases, one of which is easily distinguishable and the other inapplicable, Defendants argue that Plaintiffs fail to allege a plausible claim under 2 U.S.C. § 7 and 3 U.S.C. § 1, because 10 ILCS 5/19-8(c) "ensure[s] that all voters, including those who cannot go to the polls in person on Election Day" can exercise their right to vote, and argue that this *policy goal* does not "conflict[] with the Federal Election Statutes." ECF 26 at 16, 18 (citing *Bomer*, 199 F.3d at 775 and *Way*, 492 F. Supp. 3d at 372). Neither case supports Defendants' position. In fact, as Plaintiffs previously explained in another filing, *Bomer* lends authority to their argument that Election Day must be "consummated" by the date proscribed by Congress. ECF 33 at 12-13.

In *Bomer*, the plaintiff challenged Texas' early voting statute that allowed voting up to 17 days prior to Election Day as unconstitutional under both 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1. 199 F.3d at 774. The plaintiff contended that "*the* day for the election" under federal law meant that the election must occur on a single day and that voting prior to that day violated federal law. In essence, the plaintiff claimed that *any* early voting, either by absentee or in-person, violated federal law. *Id.* at 775. The Fifth Circuit rejected this argument finding that neither *Foster* nor the Election Day statute "require[s] all voting to occur on federal election day," only that the election cannot be "consummated" prior to Election Day. *Id.* at 776. Since the "election" is "the combined actions of voters and officials meant to make a final selection of an office holder," Texas' early voting statute did not contravene federal Election Day statutes. *Id.* (citing *Foster*, 522 U.S. at 71).

Plaintiffs' claims do not challenge early voting in Illinois. *Bomer* only reinforces *Foster*'s central holding that states cannot consummate the election of federal officials *before* Election Day. Here, because a contested election of candidates for a congressional office can *never* be

consummated by Election Day due to Illinois' fourteen-day Receipt Deadline after Election Day, the consummation can never take place on the date chosen by Congress. *Foster*, 522 U.S. at 71-72. State election regimes can no more require that "the combined actions of voters and officials meant to make a final selection of an officeholder" occur *before* Election Day than they can allow these combined actions to occur *after* Election Day. *Id.* Both types of election regimes–whether an October Election Day in Louisiana or an Election Day two weeks after the first Tuesday in November in Illinois–"purport to affect the timing of federal elections." *Id.* at 73. Like Louisiana's election in October, Illinois' process of accepting ballots received up to two weeks after Election Day requires a "further act" that influences the final result of the national elections. If anything, *Bomer*'s reasoning supports the position that states may hold voting open before Election Day but cannot "consummate" an election on any day other than Election Day. As alleged in the Complaint, Illinois' process affects the timing of federal elections by holding voting open fourteen days past Election Day and not "consummating" Election Day on the date chosen by Congress.

*Way* serves Defendants no better. In *Way*, plaintiffs challenged a New Jersey statute that allowed for VBM ballots without postmarks to be canvassed if mailed on or before Election Day and received by the local election authorities within two days after that date. 492 F. Supp. 3d at 358. There, plaintiffs moved for emergency relief seeking to enjoin enforcement of this New Jersey law just before the November 8, 2020 general election. On an expedited schedule, the district court concluded that plaintiffs could not show a likelihood of success on the merits that the Election Day statutes preempted state law that authorized canvassing of late VBM ballots. *Id.* at 373. According to the district court, since the New Jersey law mandated that non-postmarked VBM ballots must be received within 48 hours after Election Day, and since First Class U.S. Mail is generally

delivered within that time period, the probability that ballots would be cast after Election Day was "remote." *Id.* at 371.

Defendants' reliance on *Way* at this stage of the proceedings is misplaced for several reasons. First, *Way* operated on an expedited procedural track without the benefit of either time or discovery during the highly contentious 2020 election. The plaintiffs moved for preliminary relief, less than two months before the November 8, 2020 general election. The New Jersey law allowed canvassing of VBM ballots without postmarks up to 48 hours after Election Day and that since the Postal Service required "no fewer than two days in transit from voters to election officials," such ballots were presumed timely. 492 F. Supp. 3d at 371. In the limited time between the lawsuit and Election Day and without the benefit of discovery, the plaintiffs failed to rebut the presumption with evidence that VBM ballots were counted after Election Day. Such proceedings "based on expedited briefing and little opportunity for the adversarial testing of evidence" force courts to make "rushed, high-stakes, low information decisions." *Dep't of Homeland Security v. New York*, 140 S. Ct. 599, 600 (Gorsuch, J., concurring).

But even if this Court were to accept *Way*'s legal reasoning as persuasive, there is one key factual difference here which weigh in Plaintiffs' favor. Illinois' fourteen-day Receipt Deadline for VBM ballots, even those without a postmark, goes well beyond the deadline imposed by the New Jersey law. *Way* specifically noted that First Class U.S. Mail was generally delivered within the 48-hour time period which made it unlikely that VBM ballots cast in New Jersey occurred *after* Election Day. 492 F. Supp. 3d at 371. Not so here. Illinois' fourteen-day period makes canvassing late arriving ballots a virtual certainty. Plaintiffs alleged these facts, which must be construed as true on a motion to dismiss. ECF 1 at ¶¶ 19-22

Second, due to the proximity at the time of the November 2020 general federal election, the denial of the preliminary injunction in *Way* was as much a decision about the equities as the merits. The district court noted that "federal courts should ordinarily not alter the election rules on the eve of an election" since conflicting election procedures "can 'result in voter confusion' and incentivize voters 'to remain away from the polls.'" 492 F. Supp. 3d at 375-76 (quoting *Purcell*, 549 U.S. at 4-5). Moreover, the court found that logistical challenges to the change in election rules on the eve of Election Day and the impediment an injunction would cause to defendants' efforts to educate the general public regarding the new rules would result in "significant harm" to defendants. *Id.* at 374-75. Unlike the parties in *Way*, Plaintiffs here have not sought emergency relief. The Court here has the benefit of time that the *Way* court did not and need not weigh the equities on a motion to dismiss.

Finally, for the reasons set forth in Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment (ECF 33 at 4-16), Plaintiffs respectfully submit the district court's decision in *Way* was wrong as a legal matter. Counting ballots received *after* Election Day is contrary to the ordinary public meaning of the Election Day statutes and clearly extends the deadline for "the combined actions of voters and officials meant to make a final selection of an office holder." *Foster*, 522 U.S. at 67. Accordingly, Plaintiffs have alleged sufficient facts that plausibly show a violation of 2 U.S.C. § 7 and 3 U.S.C. § 1.

**IV.     Plaintiffs Pled Sufficient Facts to Show Unconstitutional Burdens in Violation of the First and Fourteenth Amendments.**

a. Under *Foster*, the *Anderson-Burdick* Test Does Not Apply to Plaintiffs' Claims

18

Defendants' final argument in support of dismissal assumes that the *Anderson-Burdick* test applies in this case.[18] As Plaintiffs previously noted, it is not clear the Court needs to apply that test in determining a constitutional violation here. *See* ECF 33 at 17, n. 23 (collecting cases that did not apply the *Anderson-Burdick* test); *see also Tully v. Okeson*, 977 F.3d 608, 616 n.6 (7th Cir. 2020) (declining to apply *Anderson-Burdick* "where only the claimed right to vote by mail is at issue"). Notably, *Foster* was decided after the Court's *Anderson* and *Burdick* decisions yet the Court ignored the test. *Foster*, 522 U.S. at 74.

The typical *Anderson-Burdick* context involves a weighing process to determine whether an otherwise valid law is an impermissible burden on a voter's right to vote that he or she should not have to shoulder. For example, a state regulation requiring citizens to present identification to vote is facially valid. However, requiring a citizen to present identification before being allowed to vote is a burden that must be weighed against the government's interest. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2007). Here, Plaintiffs are not alleging that a facially valid regulation is a burden they must shoulder before voting. Rather, Plaintiffs allege that an Illinois' Time regulation conflicts with a federal Time regulation and, therefore, violates federal law. "The regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex parte Siebold*, 100 U.S. 371, 384 (1880)). There is never a circumstance where unlawful ballots are facially acceptable and, thus, no reason to weigh it against potential burdens.

b. Even If the *Anderson-Burdick* Test Applies, Plaintiffs Have Pled Sufficient Facts to Show Illinois' Receipt Deadline Impermissibly Burdens Their First and Fourteenth Amendment Rights.

---

[18]     *Anderson*, 460 U.S. 780 and *Burdick v. Takushi*, 504 U.S. 428 (1992) (hereinafter "*Anderson-Burdick* test").

Plaintiffs are severely burdened by Illinois' law that holds voting open fourteen days after Election Day. Counting untimely votes substantially increases the total pool of votes and forces Plaintiffs to allocate substantial resources for fourteen additional days of Election Day activities. ECF 1 at ¶¶ 33-34. As a citizen with the right to stand for office, Congressman Bost is forced to spend significant resources, such as two additional weeks organizing, funding, and running his campaign. *Id.* at ¶ 46. As registered voters, Plaintiffs' timely and lawfully cast ballots are diluted by Defendants' counting of unlawful and untimely ballots received up to two weeks after Election Day. *Id.* at ¶ 41. Each Plaintiff sufficiently and plausibly alleges burdens to their rights under the First and Fourteenth Amendments by reason of Illinois' unlawful extension of Election Day. Such allegations were sufficient under *Foster* and *Carson*.

Defendants argue that Plaintiffs' burdens are irrelevant under applicable law since the Illinois statute makes it easier to vote rather than harder. ECF 26 at 16 and 18. But federal courts have recognized burdens on the right to vote that do not directly affect a voter's ability to cast a ballot. The "right of suffrage can be denied by a debasement or dilution of … a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Judicial Watch v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind. 2012) (quoting, *inter alia*, *Reynolds*, 377 U.S. at 555); *Libertarian Party of Ind. v. Marion Cnty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1463 (S.D. Ind. 1991) (restricting party's access to voter registration list burdens "members' freedom to associate to express their views to the voters and the voters' ability to express preferences in light of the political views"); *see also U.S. v. Saylor*, 322 U.S. 385, 386, 389-90 (1944) (upholding a charge that stuffing a ballot box injured citizens "in the free exercise" of their "rights and privileges," which included the right "to have their votes … given full value," unimpaired by unlawful votes); *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964) (voters' constitutional rights violated

if congressional districts have unequal populations, diluting the weight of the voters' lawfully cast votes in districts with greater population counts).

Defendants invite this Court to impose a straight-line test, where a voter can never experience a severe *Anderson-Burdick* burden if the electoral regulation does not restrict access to the ballot. But as the case law makes clear, there is no "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." *Crawford*, 553 U.S. at 191. As stated above, the courts have recognized burdens on the right to vote in both the vote denial and the vote dilution context. It is not the context of the burden but rather the magnitude, where the court weighs the harm on the voters' First and Fourteenth Amendment rights against the state's interest in administering the voting regulation. *Id.* (citing *Burdick*, 504 U.S. at 434). The burden does not depend on whether the voter was *denied* the right to vote, and the Court has never expressly limited the *Anderson-Burdick* test to situations that involve *denial* of the right to vote or run for office. Contrary to Defendants' contention, courts have not limited burdens on the right to vote to circumstances involving dilution in the reapportionment context. *See King*, 993 F. Supp. 2d at 924; *Libertarian Party of Ind.*, 778 F. Supp. at 1463.

Likewise, a candidate's constitutional right to stand for office is not limited to whether the voting regulation restricts the candidate's ability to run. The Court has found that a burden on a candidate's rights is also a burden on a voter's right to freely associate and express political preferences. *See e.g.*, *Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004) ("the right to stand for office is to some extent derivative from the right of the people to express their opinions by voting." (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986))). Congressman Bost alleged the burdens

21

imposed by Illinois' unconstitutional extension of the Election Day deadline forces him to spend a substantial amount of resources in conducting post-election campaigning and monitoring of the late arriving VBM ballots. These burdens cannot be cast aside simply because Congressman Bost was able to obtain a spot on the ballot.

The more severe the burden on constitutional rights, "the more rigorous the inquiry into its justifications." *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 523-24 (7th Cir. 2017) (citation omitted). But the Court need not engage in a "rigorous" inquiry into Defendants' justifications because Defendants' own interest in unlawfully extending voting fourteen days fails even the rational basis test. While states do have an interest in ensuring that all lawfully cast votes are adequately counted and in ensuring that any delays in third-party VBM postal service delivery does not cause a voter's disenfranchisement, such an interest cannot extend so far that it violates the timeline required by federal law. Congress passed the first Election Day statutes more than 175 years ago pursuant to its inherent power under the Electors Clause. 3 U.S.C. § 1. Twenty-seven years later, Congress expanded the application of Election Day statutes pursuant its Elections Clause powers. 2 U.S.C. § 7. Congress did so to establish a uniform date for federal elections across the United States and to avoid the "evil arising from the election of members of congress occurring at different times in the different states." *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884). Therefore, Electors and Elections Clause legislation inherently mandates that conflicting state regulations yield to Congress' determinations. *See Foster*, 522 U.S. at 69; *see also Ex parte Siebold*, 100 U.S. at 384 (federal election laws governing federal elections "are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative.").

Defendants here attempt to claim an interest in extending absentee voting so that eligible voters have their late votes counted. ECF 26 at 17 (citing *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004)). *Griffin* involved a claim alleging a "blanket right of registered voters to vote by absentee ballot," 385 F.3d at 1130, a right not protected by the First and Fourteenth Amendments. *Burdick*, 504 U.S. at 434. *Griffin* noted the state's broad authority to set electoral regulations on absentee balloting, in order to curb fraud and other abuses. 385 F.3d at 1130. But the state cannot go so far in extending absentee balloting regulations where those regulations encroach on and conflict with existing federal law setting a uniform date for voting. *Cf. Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1192 (9th Cir. 2021) (rejecting plaintiff voters' attempt to extend the federally prescribed Election Day in order to cure absentee ballots without signatures since a "voter cannot legally submit new votes after election day.").

Defendants here claim an interest in increasing absentee voting for eligible voters by extending voting fourteen additional days beyond the date proscribed by federal law. But Defendants can never claim a legitimate interest in violating federal law. *See Ill. Conservative Union v. Illinois*, No. 20 C 5542, 2021 U.S. Dist. LEXIS 102543, at *22 (N.D. Ill. June 1, 2021) (finding plaintiffs stated a claim to overcome the presumption of rationality under rational basis review because of the conflict between state election law and the federal National Voter Registration Act); *see also Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) (finding the state documentary proof of citizenship law violated the *Anderson-Burdick* standard and was preempted by the federal National Voter Registration Act); *Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253, 1269 (D. Utah 2015) ("a county or other local governing body cannot have a legitimate governmental interest in violating state law.").

23

Accordingly, Plaintiffs have plausibly alleged burdens both voters and candidates that overcome the presumption of rationality at this stage of the litigation.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Defendants' Motion to Dismiss Plaintiffs' Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 25.

August 22, 2022

_____*s/ Russ Nobile*_____
T. Russell Nobile
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9688
rnobile@judicialwatch.org

Christine Svenson, Esq.
(IL Bar No. 6230370)
SVENSON LAW OFFICES
345 N. Eric Drive
Palatine IL 60067
T: 312.467.2900
christine@svensonlawoffices.com

Paul J. Orfanedes (IL Bar No. 6205255)
Robert D. Popper*
Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
porfanedes@judicialwatch.org
rpopper@judicialwatch.org
elee@judicialwatch.org

*  *Application for admission or admission via pro hac vice forthcoming*