## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. BOST, LAURA POLLASTRINI, and SUSAN SWEENEY, <br><br> Plaintiffs, <br><br> v. <br><br> THE ILLINOIS STATE BOARD OF ELECTIONS, and BERNADETTE MATTHEWS, in her capacity as the Executive Director of the Illinois State Board of Elections, <br><br> Defendants. | No.: 1:22-cv-02754 <br><br> Hon. John F. Kness |

## [PROPOSED] INTERVENOR-DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Intervenor-Defendant Democratic Party of Illinois ("DPI") files its opposition to Plaintiffs' Motion for Partial Summary Judgment, ECF No. 32.

## INTRODUCTION

Plaintiffs seek extraordinary relief. They ask this Court to be the first to declare that the manner in which Illinois—along with seventeen other states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands—counts mail ballots, conflicts with federal law and therefore violates Plaintiffs' individual constitutional rights. Specifically, Plaintiffs contend that 2 U.S.C. §§1 and 7 and 3 U.S.C. § 1 (the "Election Day Statutes"), which set the Tuesday after the first Monday in November as the national election day, prohibit Illinois from counting mail ballots that were lawfully cast by eligible Illinois voters *on or before election day* but received by election officials within the two weeks after that day. The remedy that Plaintiffs seek from this Court is an injunction barring Defendants from counting *any* mail ballots received after election day, regardless of when

they were mailed. In Plaintiffs' view, access to the franchise for those who vote by mail is dependent upon U.S. Postal Service practices, such that lawful voters who have done everything right may have their ballot rejected due to mail delivery delays entirely outside of the voters' control. The Election Day Statutes do not require this absurd result.

## BACKGROUND[1]

The Elections Clause of the U.S. Constitution grants to the states the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives . . . but the Congress may at any time by Law make or alter such regulations." U.S. Const., Art. I, § 4, cl.1. Pursuant to this power, Congress enacted 2 U.S.C. §§ 1 and 7, which establish the time for the election of U.S. Senators and Representatives as "[t]he Tuesday next after the 1st Monday in November, in every even numbered year." Similarly, Article II, Section 1, Clause 4, provides that "Congress may determine the Time of chusing the [presidential] Electors…." Pursuant to that authority, Congress passed 3 U.S.C. § 1, which sets the appointment of presidential electors for "the Tuesday next after the first Monday in November, in every fourth year."

In accordance with these statutes, Illinois law requires all ballots, including mail ballots, to be cast by the federally mandated election day. Only mail ballots that have been postmarked "no later than election day," or, if not postmarked, have been certified and dated by the voter on or before election day, may be counted. 10 Ill. Comp. Stat. Ann. § 5/19-8(c) (the "Receipt Deadline"). Such ballots must be counted as long as they are delivered by the postal service before the close of the period for counting provisional ballots cast in that election, *id.*, which is 14 days after election day, *id.* § 5/18A-15(a). Illinois's Receipt Deadline is far from unique: Seventeen other

---

[1] DPI agrees with Plaintiffs that their Motion concerns a pure question of law. But Paragraphs 4, 8 and 9 of Plaintiffs' Statement of Material Facts, ECF No. 31, contain improper legal conclusions and should be disregarded. L.R. 56.1(d)(4), (e); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015).

states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands also have laws allowing mail ballots cast on or before election day but received after election day to be counted.[2]

Plaintiffs, who are Republican voters and candidates for federal office in Illinois, allege that the Receipt Deadline violates their individual rights because it conflicts with Congress's command that election day take place on the "Tuesday next after the first Monday in November." They argue that federal law prohibits Illinois from counting *any* vote-by-mail ballots received after election day, regardless of when they were cast or postmarked. Compl., ECF No. 1, ¶¶ 26, 28, 30, 40, 57; Plfs. Mem. in Support of Mot. for Summ. Judgment, ECF No. 33 ("Mot."), at 1, 3. In the November 2020 general election for president and Congress, up to 266,417 vote-by-mail ballots— accounting for 4.4 percent of the total vote—were received after election day in Illinois. ECF No. 31, ¶ 19. According to Plaintiffs, none of these ballots should have been counted. They seek a permanent injunction prohibiting Defendants from counting any ballots received after election day in future congressional and presidential elections. Compl. at 11.

In their Motion for Partial Summary Judgment, Plaintiffs seek a declaratory judgment that the Receipt Deadline violates 2 U.S.C. § 7 and their First and Fourteenth Amendment rights, as well as "an order from the Court scheduling remedial proceedings." ECF No. 32, at 1.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining

---

[2] Alaska Stat. § 15.20.081(e), (h); Cal. Elec. Code § 3020; Kan. Stat. Ann. § 25-1132; Md. Code Ann., Elec. Law § 9-309; Mass. Gen. Laws ch. 54, § 93; Miss. Code Ann. § 23-15-637; Nev. Rev. Stat. § 293.269921; N.J. Stat. Ann. § 19:63-22; N.Y. Elec. Law § 8-412; N.C. Gen. Stat. § 163A-1310; N.D. Cent. Code §§ 16.1-07-09; 16.1-15-25; Ohio Rev. Code § 3509.05; Or. Rev. Stat. § 253.070; Tex. Elec. Code § 86.007; Utah Code Ann. § 20A-3a-204; Va. Code § 24.2-709; Wash. Rev. Code § 29A.40.091; W. Va. Code §§ 3-3-5, 3-5-17; D.C. Code § 1-1001.05(a)(10A); P.R. Laws Ann. tit. 25. § 3146.8; V.I. Code Ann. tit. 18, § 665.

whether summary judgment is appropriate, courts are to view the facts and draw reasonable inferences in the light most favorable to the non-moving party." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022).

## ARGUMENT

As explained in DPI's Proposed Motion to Dismiss, ECF No. 13-1, Plaintiffs' claims fail at the threshold. Plaintiffs lack Article III standing to assert their causes of action, having alleged only generalized grievances and speculative injuries. This Court therefore lacks jurisdiction to consider Plaintiffs' motion for partial summary judgment. DPI will not rehash that argument here, as the motions to dismiss are being briefed separately.

But even if this Court had jurisdiction to consider them, Plaintiffs' claims fail as a matter of law. The crux of Plaintiffs' argument is that counting mail ballots received after election day conflicts with the federal Election Day Statutes. Plaintiffs' interpretation of the Election Day Statutes is fundamentally flawed, and their motion for partial summary judgment should be denied.

## I. Illinois's Receipt Deadline does not conflict with the Election Day Statutes.

The Receipt Deadline is entirely consistent with—and therefore not preempted by—the Election Day Statutes. "[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). The Elections Clause grants the states "comprehensive . . . authority to provide a complete code for congressional elections, not only as to times and places, but in relation to . . . prevention of fraud and corrupt practices, *counting of votes*, [and] duties of inspectors and canvassers," unless Congress should "supplement these state regulations or . . . substitute its own." *Smiley v. Holm*, 285 U.S. 355, 366-67 (1932) (emphasis added). Where

4

Congress "declines to preempt state legislative choices," the Elections Clause "invests the States with responsibility for the mechanics of congressional elections." *Foster v. Love*, 522 U.S. 67, 69 (1997).

Here, there is no conflict between the Election Day Statutes and Illinois's Receipt Deadline, let alone the "direct[]" conflict required to overcome the State's "discretion and flexibility" to establish the mechanics of federal elections. *Bomer*, 199 F.3d at 775. While "Congress has the authority to compel states to hold [federal] elections on the dates it specifies," *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1170 (9th Cir. 2001), the Receipt Deadline does nothing to alter that date. To the contrary, the Receipt Deadline requires that, to be counted, mail ballots must be voted "*no later than election day*." 10 Ill. Comp. Stat. Ann. § 5/19-8(c) (emphasis added).

"Federal law does not provide for *when* or *how* ballot counting occurs," *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 353 (3d Cir. 2020), and the Election Day Statutes "are silent on methods of determining the timeliness of ballots," *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020). Therefore, because Congress has *not* codified a receipt deadline that competes with Illinois's, "compliance with both [the Receipt Deadline] and the federal election day statutes does not present 'a physical impossibility,'" and no preemption has occurred. *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001) (citation omitted) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)); *see also United States v. Gradwell*, 243 U.S. 476, 485 (1917) (observing that Congress "leave[s] the conduct of the election of its members to state laws" and "that whenever it has assumed to regulate such elections it has done so by positive and clear statutes"); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) (recognizing that "the determination of th[e] balance" between allowing time for voters to request mail ballots and "building enough flexibility into the election timeline to guarantee that

ballot has time to travel through the USPS delivery system to ensure that the completed ballot can be counted" "is fully enshrined within the authority granted to the [state] Legislature").

This case is therefore readily distinguishable from *Foster*, on which Plaintiffs principally rely. There the Supreme Court considered "Louisiana's 'open primary' statute," which "provide[d] an opportunity to fill the offices of United States Senator and Representative during the previous month" before the date mandated by Congress, "without any action to be taken on federal election day." *Foster*, 522 U.S. at 68–69. The Court concluded that this system "runs afoul of the federal statute" because it permitted federal elections to be entirely consummated before the statutorily mandated election day. *Id.* at 69, 72. Here, by contrast, the Receipt Deadline does *not* set a competing date on which "a contested selection of candidates for a [federal] office [] is concluded as a matter of law." *Id.* at 72. Quite the contrary: it mandates that ballots be cast by election day.

The *Foster* Court expressly declined to interpret the Election Day Statutes beyond the limited issue before it. *See id.* at 72 ("[O]ur decision does not turn on any nicety in isolating precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute."). It held "*only*" that the "combined actions of voters and officials meant to make a final selection of an officeholder" "may not be consummated *prior* to federal election day." *Id.* at 71, 72 n.4 (emphases added). It certainly did not rule on what may be accomplished *after* election day. Indeed, "official action to confirm or verify the results of the election extends well beyond federal election day." *Millsaps*, 259 F.3d at 546 n.5. Election officials must, for example, "count and record the votes," 10 Ill. Comp. Stat. Ann. § 5/17-18, tally and certify vote totals, *id.* § 5/17-21, and announce the results, *id.* § 5/22-7. Because "'final selection' of an officeholder requires more than mere receipt of ballots cast by voters," *Millsaps*, 259 F.3d at 545-46, Plaintiffs cannot justify their arbitrary selection of "receipt" as the point at which "election

day" activities end. *See id.* at 546 ("With so many administrative actions necessary under [state] law to finalize the voters' preference for a candidate, the plaintiffs' focus on the single act of receiving a ballot from a voter presents an unnatural and stilted conception of the actions taken by officials under [the state's] election laws and loses sight of the fact that an official's mere receipt of a ballot without more is not an act to make a final selection."). Plaintiffs' position is thus inconsistent not only with the *Foster* Court's "refusal to give a hyper-technical meaning to 'election,'" but also with common sense and "universal, longstanding practice" of post-election day ballot processing. *Bomer*, 199 F.3d at 776.[3]

Congress's purpose in enacting the Election Day Statutes confirms that "election day" is the day by which voters must make their "final selection" by casting their ballots. *Foster* and its progeny explained that the Election Day Statutes were enacted "to prevent States that voted early from unduly influencing those voting later, to combat fraud by minimizing the opportunity for voters to cast ballots in more than one election, and to remove the burden of voting in multiple elections in a single year." *Millsaps*, 259 F.3d at 541. In other words, it was important for there to be one national "election day" after which voters' decisions may no longer be altered or influenced by, for example, results from other states (as with the Louisiana statute in *Foster*). None of these objectives is hindered by the Receipt Deadline. Voting is "consummated" on election day, when the voter's ballot and certification must be deposited in the mail. After the ballot and attached certification have been completed and mailed, the voter has made their "final selection" and can neither alter nor withdraw the ballot.

---

[3] Plaintiffs acknowledge that certification "occur[s] several weeks after Election Day," but maintain that this "does not change th[eir] analysis" because "[o]therwise, states could collaterally attack Congressional Time regulations by simply extending the certification processes." Mot. at 7 n.7. That argument makes little sense where Plaintiffs contend *any* ballots received after election day, regardless of how long the receipt deadline is "extend[ed]," are unlawful.

Plaintiffs contend that "holding voting open fourteen days after Election Day in Illinois requires 'further acts' intended to influence the result of a federal election." Mot. at 7. But this purported concern about undue influence is both unfounded and based on a complete mischaracterization of the Receipt Deadline. The Receipt Deadline does not "hold[] voting open" after election day; all votes must be cast and deposited "no later than election day." 10 Ill. Comp. Stat. Ann. § 5/19-8(c). And Plaintiffs fail to explain how the Receipt Deadline allows voters to unduly "influence the result" of congressional elections where the only "acts" that occur after election day are the receipt, canvassing, counting, and certification of ballots. None of these acts involve the voter, or in any way influence the voter's decision. It is *Plaintiffs'* proposed rule that would inject uncertainty into the electoral process, by leaving it up to the postal service whether valid ballots cast on or before election day will be counted.

As one post-*Foster* appellate court concluded, "we cannot conceive that Congress intended the federal Election Day Statutes to have the effect of impeding citizens in exercising their right to vote." *Bomer*, 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407-08 (1872)); *accord Millsaps*, 259 F.3d at 545 ("[A]ll courts that have considered the issue have viewed statutes that facilitate the exercise of the fundamental right of voting as compatible with the federal statutes."). The Receipt Deadline facilitates Illinoisans' right to vote by ensuring that all votes cast by the election day prescribed by Congress will be counted. In stark contrast, Plaintiffs' position would disenfranchise hundreds of thousands of eligible Illinois voters who cast otherwise lawful ballots on or before election day. *See* ECF No. 31 at ¶ 19 (noting that in 2020 Illinois received 266,417 vote-by-mail ballots in the 14 days after election day). By ensuring that voters who cast their ballots by election day are not arbitrarily disenfranchised simply because the postal system, through no fault of the voters, fails to deliver ballots in a timely manner, the Receipt Deadline

8

"further[s] the important federal objective of reducing the burden on citizens to exercise their right to vote . . . without thwarting other federal concerns." *Bomer*, 199 F.3d at 777.

Plaintiffs rely on a motley assortment of antiquated authorities to cobble together their atextual argument that "election day" actually means "receipt day." None of these arguments can salvage Plaintiffs' claim.

First, the Receipt Deadline is entirely consistent with the various historical definitions that Plaintiffs cite. Election day is indeed "the day of a public choice of officers," Mot. at 10 (quoting nineteenth century dictionaries), as it is the day by which the public must make its choice. Plaintiffs' lengthy discussion of voting practices in the nineteenth and early twentieth centuries simply observes that it had previously been "physically impossible" for votes to be received after election day. Mot. at 11. Indeed, because voting by mail is, by Plaintiffs' own account, a recent innovation, it follows that the Congress that passed the Election Day Statutes would have no view at all on the subject. Illinois's understanding of "election day" as the day of voting—that is, the final day of casting one's ballot—is just as consistent with this history as Plaintiffs' proposed interpretation. Congress did not, in passing the Election Day Statutes, freeze state election practices in time.

Second, Plaintiffs' reference to the definition of "vote" in the Civil Rights Act of 1957 is immaterial and is in any case inconsistent with their position. In relevant part, the Act reads: "When used in this subsection, the word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." 52 U.S.C. § 10101(e). The Civil Rights Act, consistent with its remedial purpose,

gives the term "vote" a broad meaning, including "steps in the voting process *before entering* the ballot box, 'registration,' and . . . steps in the voting process *after leaving* the ballot box, 'having such ballot counted properly.'" *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (discussing the Voting Rights Act, which employs a similar definition). The Civil Rights Act thus reflects Congress's intent to ensure that lawful voters be given the opportunity to vote *and have their vote counted* rather than arbitrarily disenfranchised based on a technicality outside their control. *See* 52 U.S.C. § 10101(a)(2)(B) (prohibiting the denial of "the right of any individual to vote in any election because of an error or omission ... if such error or omission is not material in determining whether such [voter] is qualified ... to vote in such election"); *Schwier v.* Cox, 340 F.3d 1284, 1294 (11th Cir. 2003) (purpose of this provision was to eliminate the use of technical "excuse[s] to disqualify potential voters").

Third, Plaintiffs' tenuous reliance on a decades-old decision from the Montana Supreme Court regarding *state* law provides little to further their interpretation of the federal Election Day Statutes. The Montana Supreme Court concluded that, under *Montana* law, "voting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day." *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944). The court then went on to say: "The federal and state laws must be read together; and *since the state law* provides for voting by ballots deposited with the election officials, that act must be completed on the day designated by state and federal laws." *Id.* (emphasis added).

Significantly, Plaintiffs do not cite a single case where postmark deadlines or presumptions were found to conflict with *federal* law. *Cf. Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372-373 (D.N.J. 2020) (concluding New Jersey's postmark presumption is *not*

preempted); *Boockvar*, 238 A.3d at 386 (adopting post-election day receipt deadline and presumption of timely mailing); *Millsaps*, 259 F.3d at 545 ("Providing various options for the time and place of depositing a completed ballot does not change 'the day for the election.'") (quoting *Voting Integrity Project, Inc. v. Keisling*, Civ. No. 98-1372-AA, slip op. at 8 (D. Or. Mar. 22, 1999)). Plaintiffs ask this Court to be the very first to conclude that these laws—which have been used nationwide for decades and impact tens of millions of voters—are invalid. This Court should decline the invitation.

## II.     The Receipt Deadline does not burden Plaintiffs' First or Fourteenth Amendment rights.

Plaintiffs' claims that the Receipt Deadline violates both their right to vote and their right to stand for office protected by the First and Fourteenth Amendments fail under the *Anderson-Burdick* framework. Under that framework, courts "first consider the character and magnitude of the asserted injury" to the constitutional rights "the plaintiff seeks to vindicate," and then weigh the injury against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The first step in that analysis, however, is to determine whether the right to vote has been impacted at all. "[E]lection laws affecting the right to vote are subject to the *Anderson/Burdick* test, but election laws that do not curtail the right to vote need only pass rational-basis scrutiny," *Tully v. Okeson*, 977 F.3d 608, 616 (7th Cir. 2020), such that they need only "bear some rational relationship to a legitimate state end." *Id.* (quotation marks omitted). "And unless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake." *Id.* at 611.

Rational basis applies here because the Receipt Deadline does not in any way "make it harder" for Plaintiffs "to cast a ballot," and thus does not burden their right to vote. The expansion of voting opportunities does not diminish the rights of voters who vote using other means. Courts

have uniformly rejected this sort of zero-sum logic. *See, e.g.*, *Short v. Brown*, 893 F.3d 671, 677–78 (9th Cir. 2018) (noting that plaintiffs could cite no authority "explaining how a law that makes it easier to vote would violate" others' constitutional rights); *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 391 (W.D. Pa. 2020) (applying rational basis because use of unmanned drop boxes "doesn't directly infringe or burden Plaintiffs' rights to vote at all"); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 929 (D. Nev. 2020) (concluding, that plaintiffs challenging mail voting "cannot demonstrate a burden upon their voting rights").   For example, in *Tully v. Okeson*, a group of young voters challenged Indiana's absentee-voting scheme, which only allowed for certain categories of voters to vote absentee, including elderly voters. The Seventh Circuit applied rational basis because "Indiana's law providing absentee ballots to elderly Hoosiers does not affect the Plaintiffs' right to vote" and upheld the statute. 977 F.3d at 616. Similarly, here, the Receipt Deadline "do[es] not make it harder for anyone to cast a ballot." *Id.*

Plaintiffs do not contend otherwise. Instead, they argue that their votes "are diluted by unlawful votes received after Election Day." Mot. at 17. This argument fails for at least two reasons. First, any purported burden is entirely contingent on whether the Receipt Deadline violates the Election Day Statutes such that ballots received after election day are deemed "unlawful." As set forth above, there is no conflict between Illinois's Receipt Deadline and federal law, which means Plaintiffs' asserted burden, even if taken at face value, falls away. Second, courts have consistently held that "'no single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020) (quoting *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020)); *cf. Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 610 (E.D. Wis. 2020) ("[T]he harm of

12

having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote." (quoting *King v. Whitmer*, 505 F. Supp. 3d 720, 734-35 (E.D. Mich. 2020)). As DPI explained in its motion to dismiss, this sort of "vote dilution" fails to satisfy even the minimal requirements of Article III injury-in-fact. *See* ECF 13-1 at 5-6. Even if the Court were to find standing, Plaintiffs' asserted injury does not qualify as a "burden" on the right to vote under *Anderson-Burdick*, let alone a "severe" burden as Plaintiffs allege. *See, e.g.*, *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021) (concluding that plaintiff had standing but applying rational basis review because the challenged law did not make it harder to cast a ballot).

Plaintiffs also contend that they are burdened by their own "concern[s] about election fraud," arguing that "extending Election Day for multiple weeks allows bad actors to better target and affect close elections, undermining Plaintiffs' confidence in the integrity of Illinois' election results." Mot. at 19. But to the extent Plaintiffs imply that ballots cast unlawfully *after* election day will be counted as a result of the Receipt Deadline, they have provided no evidence to suggest that the Receipt Deadline has or will lead to fraud or leaves Illinois elections vulnerable to unidentified "bad actors." Plaintiffs' declarations simply express rather than validate their concerns. *See* L.R. 56.1(g); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 461 (7th Cir. 2014) (explaining that evidence presented at summary judgement must consist of "legitimate facts" rather than "improper inferences and speculation" in compliance with Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence 602). Plaintiffs' unsubstantiated fears do not amount to infringement of their constitutional rights. *See Boockvar*, 493 F. Supp. 3d at 391 (holding the fact that "Plaintiffs feel" that a state's election rules "are insufficient to prevent fraud or illegal voting is of no significance"); *Paher*, 457 F. Supp. 3d at 928 (applying *Anderson-Burdick* balancing and finding that the State's interest far outweigh Plaintiffs' where, among other things,

Plaintiffs' theory that mail voting will result in voter fraud is without any factual basis).

Nor do the "additional resources" that Congressman Bost must expend to "monitor late-arriving VBM ballots" constitute a "burden" on his First or Fourteenth Amendment rights. Mot. at 16-17. Congressman Bost does not adequately explain what those resources are, or what it means to "respond" to ballots received within the period prescribed by Illinois law. Instead, Congressman Bost's argument appears to be that, because of the Receipt Deadline, there will be more ballots to "monitor and evaluate."[4] By that reasoning, *any* election law that results in more Illinoisans being able to effectively cast their ballots would impose a "severe burden" on Congressman Bost's own right to stand for office. But, as described above, courts have uniformly rejected that type of zero-sum analysis. Moreover, although Illinois law allows campaigns to send properly credentialed poll watchers to polling places, 10 Ill. Comp. Stat. Ann. § 5/17-23, that is an activity that Congressman Bost has undertaken on his own initiative to address the entirely speculative possibility that "illegal" votes will be counted. *See Donald J. Trump for President, Inc. v. Way*, No. 20-10753, 2020 WL 6204477, at *11 (D.N.J. Oct. 22, 2020) (finding plaintiffs' "declarations attesting to the need to hire and educate poll watchers in order to 'challenge election officials' decisions' . . . unavailing" as plaintiffs "'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 (2013))).

On the other side of the ledger, the interest of the State in ensuring that its voters are not

---

[4] Congressman Bost's declaration asserts that the "volume of 'Election Day' resources needed has become even greater because many of these late-arriving ballots have discrepancies (e.g., insufficient information, missing signatures, dates, or postmarks) that need to be resolved." Bost Decl. ¶ 15. That assertion does not appear in Plaintiffs' Rule 56.1 Statement and should be disregarded. L.R. 56.1(g). But notably, Congressman Bost's declaration does *not* say that "late-arriving" ballots have a higher rate of discrepancies than ballots that arrive on or before election day and Plaintiffs do not present any evidence on that point.

disenfranchised by postal service delays is weighty—plainly satisfying rational basis review. "States have an important interest in promoting voter participation in the electoral process." *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011). "These state interests constitute the very backbone of our constitutional scheme— the right of the people to cast a meaningful ballot." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1084 (10th Cir. 2018); *see also Paher*, 457 F. Supp. 3d at 929 ("safeguard[ing] the voting franchise" is "[an] indisputably compelling and longstanding interest[]").

Illinois also has a strong interest in maintaining clarity and predictability in elections and avoiding voter confusion. *See Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 949 (7th Cir. 2019) (states have an interest in "orderly and fair elections"); *Swamp v. Kennedy*, 950 F.2d 383, 386 (7th Cir. 1991) ("Avoiding voter confusion is also a compelling state interest."). The Receipt Deadline sets a clear, predictable rule for voters to know when they must mail their ballot to ensure that it is counted. Where the rule has been in place for nearly two decades, including during the state's primary held just two months ago, Plaintiffs' requested relief would defeat both voters' expectations and the state's interest in orderly administration of elections.

The Receipt Deadline, which ensures that Illinois voters are not unreasonably disenfranchised by unpredictable mail delivery times, is rationally related to these interests and should be upheld. But even if the Receipt Deadline did in any way curtail Plaintiffs' right to vote— thus bringing it within the *Anderson-Burdick* framework—any burden on their rights is "slight" for the same reasons just discussed. *Acevedo*, 935 F.3d at 948. It is therefore easily justified by Illinois's "need for orderly and fair elections." *Id.* (quotation marks omitted).

## CONCLUSION

For the foregoing reasons, DPI respectfully requests that this Court deny Plaintiffs' Motion for Partial Summary Judgment.

August 22, 2022                                    **JENNER & BLOCK LLP**


                                              By:   s/ Coral A. Negron
                                                 _____


Coral A. Negron
Jenner & Block LLP
1099 New York Avenue, NW
Washington, D.C. 20001
Telephone: (202) 639-6875
cnegron@jenner.com

Elisabeth C. Frost
Maya Sequeira
Richard A. Medina
Elias Law Group LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
efrost@elias.law
msequeira@elias.law
rmedina@elias.law

Abha Khanna
Elias Law Group LLP
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

*Attorneys for Intervenor-Defendant*
*Democratic Party of Illinois*

16