IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. BOST, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE ILLINOIS STATE BOARD OF ELECTIONS, et al., <br><br> Defendants. | Civil Action No. 1:22-cv-02754 <br><br> Judge John F. Kness |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Michael J. Bost, Laura Pollastrini, and Susan Sweeney ("Plaintiffs"), through counsel, submit this Reply in Support of Plaintiffs' Motion for Partial Summary Judgment. ECF 32 and 33. Plaintiffs also respond, as necessary, to arguments made by the United States in its recently filed Statement of Interest. ECF 47.

**INTRODUCTION**

"When federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Foster v. Love*, 522 U.S. 67, 71 (1997) (discussing 2 U.S.C. § 1; 2 U.S.C. § 7 and 3 U.S.C. § 1). In *Foster*, the Court determined that it did not need to resolve the ultimate question about what was meant by "final act" or otherwise "pair[] the term 'election' […] down to the definitional bone," because Louisiana's election regime so clearly violated the Election Day statutes. *Id.* at 72. Before the Court now is *Foster*'s unanswered question: what "final act" constitutes "the election." Plaintiffs have shown that the text, structure, history, and precedent

regarding the ordinary public meaning of "the election" shows that the "final act" is ballot receipt by government officials. ECF 33 at 10-22.

Neither Defendants nor the United States provide any authorities or argument that would assist the Court in determining the ordinary, common public meaning of "the election" at the time Congress enacted 3 U.S.C. § 1 and 2 U.S.C. § 7.[1] Neither offers any textual or historical analysis regarding the ordinary public meaning of the "final act" that the *Foster* Court emphasized. Though they do not offer an alternative public meaning, Defendants are certain that Section 10 ILCS 5/19-8(c) ("Receipt Deadline") complies with the Election Day statutes. And while they offer no affidavits to contradict Plaintiffs' evidence of injury—such as Congressman Bost's sworn declaration that Illinois law now compels him to conduct Election Day activities for fourteen extra days in 34 counties—Defendants are equally certain that Plaintiffs lack standing.

The Court should grant Plaintiffs' Motion for Partial summary Judgment on Counts I and II with respect to the November 8, 2022 Congressional elections. ECF 32.

I. **Defendants' Standing Arguments Do Not Establish a Disputed Issue of Material Fact.**

At the summary judgment stage, the Court must determine whether a genuine issue of material fact exists for trial, which occurs when "there is sufficient evidence favoring the nonmoving party for [the trier of fact] to return a verdict for that party." *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996). Plaintiffs' undisputed declarations set forth sworn testimony describing the injuries they have suffered both as voters and candidates. ECF 31-4; 31-5; and 31-6. Defendants offer no affidavits or other evidence disputing these sworn statements or

---

[1] Plaintiffs submit that Proposed-Intervenor Democratic Party of Illinois' ("DPI") filings are premature and, possibly, improper. ECF 44 and 45. Plaintiffs respectfully request an opportunity to respond to DPI's filings in the event the Court grants DPI's Motion to Intervene or accepts DPI's filings as an amicus in support of Defendants.

otherwise identifying a triable issue of fact related to these claims. ECF 40 at 3. Rather, Defendants contend that Plaintiffs' declarations "wholly fail to meet th[e] burden" of showing an injury for purposes of standing. *Id.* Defendants do not claim that further discovery is needed to show a disputed issue of material fact regarding Plaintiffs' injuries. Rather, Defendants simply assert that the unrebutted evidence of Plaintiffs' injuries is inadequate to confer standing under Article III, incorporating arguments from Defendants' pending Motion to Dismiss. *Id.*

Defendants misconstrue the inquiry at the summary judgment stage, which requires the court to determine whether a genuine issue of material fact exists. "[T]he non-moving party may not merely rely on conclusory pleadings to withstand summary judgment." *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). It "must set forth specific facts in affidavits or otherwise show that there is a genuine issue of material fact that must be decided at trial." *Id.* (citations omitted). Defendants have made no such showing.

Defendants explain that alleging injuries to confer standing is not the same as showing a genuine issue of material fact regarding injuries to survive summary judgment. ECF 40 at 3 (citing *Diedrich v. Ocwen Loan Servicing*, LLC, 839 F.3d 583, 590-91 (7th Cir. 2016)). Plaintiffs agree. But to establish a disputed issue of material fact requiring trial, Defendants must actually counter Plaintiffs' evidence concerning their injuries. *Colan*, 812 F.3d at 361. Nothing in *Diedrich* suggests otherwise. In that case, the Seventh Circuit found that plaintiffs' allegations of monetary damages were sufficient to avoid dismissal at the pleading stage, *id.*, but that their claims ultimately failed at the summary judgement stage because they did not provide *any* evidentiary support that they actually suffered recoverable monetary injuries. *Id.* at 591-92. Like Defendants here, plaintiffs in *Diedrich* were a non-moving party that failed to offer any proof of a genuine issue of material fact.

Their opposition to Plaintiffs' Motion for Partial Summary Judgment here, therefore, fails for the same reasons as plaintiffs' opposition failed in *Diedrich*.

The record here shows that Plaintiffs have been injured.[2] For example, there is specific, unrebutted evidence showing that Congressman Bost must now conduct Election Day activities for fourteen additional days in 34 counties as a result of Illinois' Receipt Deadline. ECF 31-4. He must do this merely to maintain the same level of Election Day campaign activities that he was able to provide before Illinois extended its ballot Receipt Deadline. *Id.* Because Defendants have not even attempted to rebut this, they have not shown a genuine issue of material fact requiring trial.[3]

## II. Neither Defendants Nor the United States Addresses the Ordinary, Common Public Meaning of the Text of the Federal Election Day Statutes.

A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, common public meaning at the time of enactment. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020). Plaintiffs analyzed 2 U.S.C. § 7's text, structure, history, and relevant precedent to establish that the ordinary, common public meaning of the term "the election" as used in that statute is the day ballots are received by state election officials. ECF 33 at 15-22. Neither Defendants nor the United States addresses the historical record regarding the plain meaning of "the election" at the time 2 U.S.C. § 7 or 3 U.S.C. § 1 were enacted.

In particular, Defendants do not explain how the public meaning of "the election" could mean that ballots could be received two weeks after Election Day. Neither Congress nor the general

---

[2] *See* discussion at ECF 43 at 10-19.
[3] Defendants also rely on *Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020), vacated and remanded with instructions to dismiss as moot sub nom. *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) and *Donald J. Trump for President v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020). Plaintiffs previously addressed these two cases in their opposition to Defendants' Motion to Dismiss. ECF 43 at 16-17.

public contemplated extending ballot receipt deadlines two weeks after Election Day in 1845 or 1872. Voting practices in use then, such as dropping beans in a bowl, voting *viva voce*, or ticket ballots, could not be received by election officials fourteen days after Election Day. *See* ECF 33 at 17. Such votes simply had to be received on Election Day.[4] As there was no common law right to vote absentee, there was no common law mailbox rule applicable to elections.[5] *Id.* at 16-17. Election practices at the time required all "ballots," whether bean, voice, or ticket, be received by Election Day in order to be counted. The general public at the time would have affirmatively understood "the election" as the time by which all qualified voters must deliver to local election officials their ballots. As Plaintiffs elaborated, such practice did not exist at common law or during Colonial, Early Republic, Civil War, and Reconstruction eras. Nor would such practices exist until many years later. *Id.* at 15-22. Defendants do not even attempt to address how Illinois' practice is consistent with the public understanding of "the election" at the time of enactment.

By emphasizing "*the day* for the election," moreover, Congress appears to have made the conscious decision to limit voting beyond Election Day. The Nineteenth Century saw substantial changes in voting methods, from beans, to *viva voce* voting, to paper ballots, to ticket ballots, and eventually to the Australian ballot. ECF 33 at 16-21. The public and Congress would have been well aware of the evolving nature of voting practices. But by specifying "the day for the election,"

---

[4] For example, a ticket was merely paper advertisement until deposited by a voter into a ballot box on Election Day at which point the ticket became a vote. *See Burson v. Freeman*, 504 U.S. 191, 201-03 (1992) E. Evans, A HISTORY OF THE AUSTRALIAN BALLOT SYSTEM IN THE UNITED STATES, 11-12 (1917).

[5] In determining public meaning, courts often look to the development and evolution of the common-law definition, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted), or refers to dictionaries contemporaneous with the enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 228 (2014).

Congress put a hard brake on when ballots *of any kind* might be cast.[6] In other words, Congress foreclosed the possibility of using future, unforeseen election practices to circumvent its Time regulation. Instead, Congress determined that whatever manner of voting states used, all votes needed to be received by election officials on Election Day.

Defendants and the United States stress that other states currently allow voting to continue after Election Day, but neither note the recency of this trend.[7] ECF 26 at 6; and ECF 47 at 6 and 10. Regulations allowing absentee ballots to arrive after Election Day are largely a recent phenomenon.[8] The practice was *de minimis* until the recent push to expand voting by mail or no-excuse absentee voting. ECF 33 at 22, n. 21. Recent state laws extending receipt deadlines beyond Election Day can be traced back to the federal response to the 2000 election controversy. From that controversy, two competing election reform visions arose. *See* John C. Fortier & Norman J. Ornstein*, Symposium, Election Reform: The Absentee Ballot and the Secret Ballot: Challenges For Election Reform*, 36 U. Mich. J.L. Reform 483, 484 (2003) (explaining how one view sought to improve poll sites while the other believed that poll sites discouraged voting and sought to promote VBM).

---

[6] Indeed, Congress clearly considered and rejected requests to make the designated day for national elections a multiday event. Cong. Globe, 42 Cong., 2d Sess. 676 (1872); *see also Voting Integrity Project v. Keisling*, 259 F.3d 1169, 1172-74 (6th Cir. 2001).

[7] Plaintiffs previously discussed this at ECF 33 at 21-22.

[8] Nineteen states currently allow post-election receipt of ballots. *See* Tbl. 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf. of State Legis. (July 12, 2022), available at https://bit.ly/3vRBB5G. Most of those provisions were enacted after HAVA mandated states adopted provisional voting for federal elections. *See, e.g.,* Cal. Elec. Code § 3020 (2014); 10 ILCS 5/19-8 (2005); Kan. Stat. Ann. § 25-1132 (2017); Md. Code Regs. 33.11.03.08 (2004); Mass. Gen. Laws ch. 54, § 93 (2021); Miss. Code Ann. § 23-15-637 (2020); Nev. Rev. Stat. Ann. § 293.269921 (2021); N.J. Stat. Ann. § 19:63-22 (2018); N.C. Gen. Stat. § 163-231 (2009); Or. Rev. Stat. § 253.070 (2021); Utah Code Ann. § 20A-3a-204; 20A-4-301 (2020); and Va. Code § 24.2-709 (2010).

Following the 2000 election, Congress enacted § 302 of the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21082, mandating that states adopt provisional voting procedures.[9] But § 302 did not amend 2 U.S.C. § 7 or 3 U.S.C. § 1. It required that ballots be provisionally "received" at "polling places" on Election Day. 52 U.S.C. § 21082(a). It does not open the door for absentee ballots to be received weeks after Election Day while election officials resolve eligibility question regarding provisional voters. Quite the contrary, by emphasizing the need for state officials to treat provisional ballots as provisionally *received* on Election Day, Congress underscored that the original public meaning of "the election" is the day ballots are received. Further, a federal requirement that states provisionally receive certain ballots is materially different than Illinois' law, which allows ballots to be received by election officials for the first time—that is, to come to these officials' attention at all—up to 14 days after Election Day. In any event, while Congress has the authority to limit or modify any Time regulation it previously enacted, states may not do so when Congress has already proscribed a federal Election Day.[10]

Defendants respond to Plaintiffs' historical authorities by arguing that there is a "long history of congressional tolerance […] of absentee balloting." ECF 40 at 6 (quoting *Voting*

---

[9] In its most basic form, the provisional voting process allows voters who appear at a polling place to cast provisional ballots if there is a question about the voter's eligibility. 52 U.S.C. § 21082(a); *see also Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 222 (6th Cir. 2011). In this scenario, the voter marks the ballot, which is provisionally "received" by poll workers on Election Day pending a later resolution to the eligibility questions. This process ensures a vote is timely received on Election Day while allowing election officials additional time between Election Day and certification deadlines to resolve any eligibility questions. 52 U.S.C. § 21082(a)(4). Unlike the ballots in question here, provisional votes are physically received on or before Election Day.

[10] Defendants and the United States make different policy arguments as to the importance of holding voting open fourteen days after Election Day. ECF 26 at 6; ECF 40 at 4; and ECF 47 at 10 and 13. There are certainly policy arguments why Congress might want to (perhaps even should) expand Election Day or extend ballot receipt deadlines. However, such policy considerations, no matter how well intentioned, are not relevant in determining the ordinary, common public meaning and clear text of the Election Day statutes as enacted.

7

*Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169, 1175-76 (9th Cir. 2001)). But Defendants conflate absentee voting with the ballot receipt deadline. Only the latter is at issue here.[11] Defendants do not cite any comparable "long history" related to post-election ballot receipt because there is none. *Compare id.* (citing congressional allowance of absentee voting as the persuasive factor "in this difficult case"). In fact, on almost every occasion, including during passage of HAVA, UOCAVA, or the MOVE Act (discussed below), Congress either rejected requests for national legislation extending ballot receipt deadlines in federal elections, or reemphasized the importance of receipt on Election Day.[12]

Defendants' cross-reference to *Millsaps* (ECF 40 at 7) overlooks the fact that early voting in Tennessee had "no effect in deciding the winner of an election until the polls close on federal election day[.]" *Millsaps v. Thompson*, 259 F.3d. 535, 544 (6th Cir. 2001). That is not the case here, as Defendants' own press release from 2020 acknowledged that late arriving ballots can change election outcomes.[13] ECF 31-2. Plaintiffs previously explained why Defendants reliance on *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020) is misplaced. ECF 43 at 16, 23-25. The injuries alleged in that case arose from claims related to ballots received without postmarks. *Way*, 492 F. Supp. 3d at 372. Here, Plaintiffs argue that receiving ballots after Election Day violates the plain meaning of Election Day, regardless of postmark.

---

[11] Plaintiffs previously summarized the evolution of absentee voting, including the reliance on proxy voting and the creation of poll sites in the field during the Civil War to ensure Election Day receipt. ECF 33 at 17-21.

[12] The *Keisling* court also noted that unlike *Foster* there was still "a residual ritual of in person voting at central election offices still to take place on [Election Day]." *Id.* at 1174. That residual ritual in *Keisling* involved Oregon government officials receiving in-person ballots on Election Day. *Id.* In the instant case, that residual ritual has already passed, while thousands of ballots are still outstanding.

[13] The *Millsaps* court also noted the long history related to absentee voting. *Id.* at 547-49. It determined early voting was indistinguishable from absentee voting and, thus, the long history was applicable to that case. *Id.* Again, there is no such long history applicable here.

Ultimately, *Millsaps*, *Keisling*, and *Voting Integrity Project, Inc. v. Bomer,* 199 F.3d. 773 (5th Cir. 2000) (*see* ECF 40 at 7) all stand for the notion that under *Foster* voting and ballot receipt, whether via absentee or early voting, can occur before Election Day. And federal legislation such as UOCAVA certainly illustrates congressional support for early ballot receipt. However, none of those cases resolved the question of whether votes may be received *after* Election Day. And there are no UOCAVA equivalents showing Congressional support for post-election receipt. On the contrary, the historical record shows that since 1845 Congress has declined to extend ballot receipt deadlines whenever it has been proposed.

Note that post-election canvassing, certification, the announcement of results and other such ministerial acts cannot be the combined final action under *Foster* for several reasons. If, as *Foster* requires, the "final act" must occur on Election Day, then it makes no sense to claim that these acts, which generally occur days or weeks afterwards, are the "final act." Such an interpretation would render 2 U.S.C. § 7 meaningless. *See Delaware v. Pennsylvania*, Nos. 220145 & 220146, 2021 U.S. LEXIS 6295, at *60 (July 23, 2021) ("The surplusage canon … states that 'the courts must lean ... in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.'") (citations omitted).

The Elections Clause delegates to states the authority to regulate the Time, Place, and Manner of congressional elections, though Congress may make or alter regulations at any time. Art. I, § 4, cl. 1. With respect to Electors, state legislatures may direct the Manner for such appointment, but Congress may determine the Time of choosing Electors. Art. II, §2, cl. 2 and cl. 4. States cannot devise *Manner* regulations that circumvent federal *Time* regulations. *Foster* at 72-73 (rejecting state's attempt to draw a "time-manner line [as] merely wordplay, and wordplay just as much at odds with the Louisiana statute as that law is at odds with § 7"). "The regulations made

by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id*. at 69 (citing *Ex parte Siebold*, 100 U.S. 371, 384 (1880)). Accordingly, the United States' arguments that Section 10 ILCS 5/19-8(c) is a permissible Manner regulation has already been rejected. ECF 47 at 9 (attempting to characterize Section 10 ILCS 5/19-8(c) as a state "mailbox rule").[14]

As it stands now, the public meaning of "the election" is that the final selection occurs when all ballots are received and that must occur on Election Day. Because Illinois' final selection cannot occur until fourteen days after Election Day, 10 ILCS 5/19-8(c) is preempted by the federal Election Day statutes.

### III. These Proceedings Have Nothing to Do with UOCAVA Compliance or Enforcement.

The United States' only stated interest in these proceedings arises from its enforcement responsibilities related to the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), the discussion of which comes at the end of its Statement.[15] ECF 47 at 10-13. The United States discusses several cases in which ballot receipt deadlines were extended as remedies to UOCAVA violations. It never says that it will be unable to enforce UOCAVA or that Illinois will otherwise be unable to comply with UOCAVA if Plaintiffs prevail. The outcome of these proceedings will not affect, let alone impair UOCAVA compliance or enforcement.

---

[14] Plaintiffs previously explained that allowing state Manner regulations to effectively supersede federal Time regulations would provide states the ability to collaterally attack federal Time regulations. ECF 33 at 13 n.7.
[15] The United States claims no enforcement responsibilities related to 2 U.S.C. § 7 or 3 U.S.C. § 1.

UOCAVA provides military and overseas voters the right to vote by absentee ballot in federal elections.[16] 53 U.S.C. § 20302(a)(1); *see generally* Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting: The Uniformed and Overseas Citizens Absentee Voting Act*, (available at https://bit.ly/3QapF67). UOCAVA includes several federal and state obligations, including a requirement that states transmit a validly requested absentee ballot no later than 45 days before an election if requested on or before that time.[17] 52 U.S.C. § 20302(a)(8). The text of UOCAVA does not extend ballot receipt deadlines, or allow states to do so—but extensions have been used by federal courts as a *remedy* for UOCAVA violations. *See generally United States v. West Virginia*, Civ. No. 2:14-27456, 2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014). The use of extensions as a remedy to mitigate injuries caused by a jurisdiction's late transmission of ballots does not change any of the claims or arguments raised by Plaintiffs in this action. But even if UOCAVA expressly authorized post-election receipt of UOCAVA ballots, which it does not, Congress can amend federal Election Day statutes at will and otherwise make specific carveouts as needed.[18] States cannot.[19]

---

[16]   52 U.S.C. §§ 20301 to 20311, as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub L. No. 111 84, Subtitle H, §§ 575 589, 123 Stat. 2190, 2318 2335 ("MOVE Act").

[17]   UOCAVA includes several other provisions designed to accelerate ballot access *before* Election Day, such as the right to request and receive registration forms, absentee ballot requests, and blank absentee ballots electronically, or the right to use a Federal Write-In Absentee Ballot under certain conditions. *See* 52 U.S.C. §§ 20302(a)(6)(A) and 20303. *See also* Federal Voting Assistance Program ("FVAP") Guide to UOCAVA Voting in Illinois available at https://bit.ly/3qdyKjX State of Illinois Military & Overseas Voter Guidelines by Il. State Bd. of Elections (Feb. 2022) available at https://bit.ly/3TGoIFy.

[18]   Indeed, Congress considered and/or rejected recommendations that it extend ballot receipt deadlines for overseas voters. *The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules and Admin.*, 95th Cong. pp. 13, 34, 59, 67, 84, and 94 (1977) available at https://bit.ly/38z9zU9; *see generally* Reagan at pp. 1-3 (summarizing federal legislation regarding military and overseas voters from 1942-2014).

[19]   Contrary to the United States' assertion, Michigan does indeed require absentee ballots to be received by Election Day. *See* ECF 47 at 13 n.8; *compare* Mich. Comp. Laws 168.764a ("The

In its Statement, the United States lists enforcement actions it has brought that involved court-ordered extensions of the ballot receipt deadline, including two brought against Illinois. ECF 47 at 12-13. It cites these actions to suggest that orders authorizing post-election receipt of ballots are common remedies for UOCAVA violations. But the ability of courts to remediate such violations is not in question here. The United States does not explain or even identify which of these cases would have been decided differently as a result of this case. Plaintiffs submit none would.

The United States also contends that post-election receipt is a "prophylactic protection of UOCAVA voters." ECF 47 at 13. Certainly, the two suits filed against Illinois show that these protections did not ensure UOCAVA compliance.[20] In any case, federal courts are fully equipped to address UOCAVA violations on a case-by-case basis, which they have done since its enactment in 1986.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should grant its Motion for Partial Summary Judgment. ECF 32.

---

ballot must reach the clerk or an authorized assistant of the clerk before the close of the polls on election day. An absent voter ballot received by the clerk or assistant of the clerk after the close of the polls on election day will not be counted."). The United States splits hairs citing a Michigan law that automatically extends ballot receipt deadlines whenever a local jurisdiction knowingly violates UOCAVA's 45-day deadline. Michigan enacted this law after it suffered a near-statewide failure to timely transmit ballots in 2012, which led the United States to sue Michigan. Shortly afterwards, Michigan enacted legislation formally adopting this remedy at the state level. Presumably, this state-level remedy is superfluous because the United States will continue to enforce UOCAVA whenever Michigan admits a violation.

[20] In addition to the two against Illinois, the United States cites enforcement actions against New York and West Virginia, which allowed post-election receipt of ballots at the time of the enforcement action. The United States has brought 52 enforcement actions since UOCAVA was enacted in 1986. *See Voting Section Litigation*, DEP'T OF JUST. (September 9, 2022), available at https://bit.ly/3QxWqKX.

September 14, 2022

| | |
|---|---|
| *s/ Russ Nobile* | Paul J. Orfanedes (IL Bar No. 6205255) |
| T. Russell Nobile | Robert D. Popper* |
| JUDICIAL WATCH, INC. | Eric W. Lee |
| Post Office Box 6592 | JUDICIAL WATCH, INC. |
| Gulfport, Mississippi 39506 | 425 Third Street SW, Suite 800 |
| Phone: (202) 527-9688 | Washington, DC 20024 |
| rnobile@judicialwatch.org | Phone: (202) 646-5172 |
| | porfanedes@judicialwatch.org |
| Christine Svenson, Esq. | rpopper@judicialwatch.org |
| (IL Bar No. 6230370) | elee@judicialwatch.org |
| SVENSON LAW OFFICES | |
| 345 N. Eric Drive | |
| Palatine IL 60067 | |
| T: 312.467.2900 | * *Application for admission or admission* |
| christine@svensonlawoffices.com | *via pro hac vice forthcoming* |