IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. BOST *et al.*, | |
| Plaintiffs, | |
| | No. 22-cv-02754 |
| v. | |
| THE ILLINOIS STATE BOARD OF ELECTIONS *et al.*, | Judge John F. Kness |
| Defendants. | |

## MEMORANDUM OPINION & ORDER

This case challenges an Illinois election statute that governs the time for counting ballots received after the nationally-uniform day set for federal elections ("Election Day"). That Illinois law (the "Ballot Receipt Deadline Statute" or "Statute") allows ballots to be received and counted for up to 14 days after Election Day. Plaintiffs are former and prospective candidates for federal office (and registered voters) who allege that the Ballot Receipt Deadline Statute, contrary to federal law, dilutes their votes and forces them to spend money and time campaigning after Election Day. To realize their claims, Plaintiffs have sued the Illinois State Board of Elections, which supervises the administration of Illinois's election laws, and its director, Bernadette Matthews. Plaintiffs seek a declaratory judgment that the Statute deprives them of their constitutional and statutory rights; they also seek a permanent injunction prohibiting Defendants from enforcing the Statute.

As explained more fully below, because Plaintiffs fail to plead sufficiently concrete, particularized, and imminent injuries sufficient to meet the requirement of standing under Article III of the United States Constitution, the Court lacks the power to hear this case. And even if standing existed, the Eleventh Amendment serves as an independent bar to this suit. In any event, Plaintiffs have not plausibly alleged that the Ballot Receipt Deadline Statute conflicts with federal law. As a result, and on the motion of Defendants, the case is dismissed without prejudice.

## I.   BACKGROUND

Since the founding of our country, the law governing voting in federal elections has been a peculiarly federated affair. Under the United States Constitution, it is up to the legislatures of the states to prescribe the "Times, Places and Manner" of holding elections for U.S. senators and representatives. U.S. Const. art. I, § 4, cl. 1. But the Congress may also "at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 1, cl. 1. For choosing the Electors who actually elect the President, the Constitution states that "Congress may determine the Time of ch[oo]sing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4. But the power to appoint electors and the mode of their appointment belongs exclusively to the states. *McPherson v. Blacker*, 146 U.S. 1, 27 (1892).

Congress has since exercised its Constitutionally-conferred legislative power to set what has become one "Election Day" for the entire country. 3 U.S.C. §§ 1, 21(1); 2 U.S.C. §§ 1, 7. But despite that national standard, the states retain significant

discretion—frequently exercised—to prescribe the times, places, and manner of conducting elections. For better or worse, with the advent of technology and changing voter habits and preferences, gone are the days in which all votes were cast (and counted) on one Election Day. Numerous states now allow votes to be cast by mail; those ballots are often transmitted to election authorities (by mail or other means) before or on Election Day. And to accommodate the potential for delayed deliveries of otherwise-timely votes, a substantial number of states that permit voting by mail now also allow mailed votes to be counted for some time past Election Day.

This evolution in voting habits has, perhaps predictably, led to occasional uncertainty in the administration of elections. Under the power conferred by Congress, state legislatures are permitted to set rules for ballots received by mail. Because of the possibility that validly cast ballots will not be received or counted by election officials before Election Day is over, many state legislatures have ballot receipt statutes that set a timeframe within which a mail-in ballot may be received post-Election Day yet still counted toward the final tally. Illinois is one of those states, and that choice has led to the dispute currently before this Court.

In Illinois, the time for counting ballots received after the date of a federal election is governed by statute (10 Ill. Comp. Stat. Ann. § 5/19-8(c)). (Dkt. 1 ¶ 14.) That law allows ballots cast in federal elections to be received and counted for up to 14 days after Election Day, so long as the ballot was postmarked or certified on or before Election Day. (*Id.* ¶ 15.) Under this statutory scheme, these mail-in ballots

have the same weight and force that a ballot cast at the polls on Election Day would have. (*Id.* ¶ 16.)

Plaintiffs in this case are registered voters, as well as former and prospective candidates for both federal office and appointment as Presidential Electors. Plaintiffs allege that the Ballot Receipt Deadline Statute violates the Constitution and federal statutory law, including 2 U.S.C. § 1, 2 U.S.C. § 7, and 3 U.S.C. § 1. (Dkt. 1.) More specifically, Plaintiffs allege that the Statute violates 2 U.S.C. § 7 and 3 U.S.C. § 1 by authorizing Illinois election officials to count untimely votes, thus diluting the value of their timely ballots. Plaintiffs also allege that the Statute deprives them of their rights as candidates under the First and Fourteenth Amendments by forcing them to spend time and money to organize, fund, and run their campaign after Election Day. Plaintiffs say that, because ballots are being counted up to two weeks after Election Day, they must continue to campaign and to incur inevitable campaign-related expenses. Plaintiffs allege that the Statute violates 2 U.S.C. § 7 and 3 U.S.C. § 1 and is thus facially invalid.

In an effort to realize these Constitutional and statutory claims, Plaintiffs have sued the Illinois State Board of Elections ("State Board")—which is responsible for supervising the administration of election laws in Illinois—and its Executive Director, Bernadette Matthews (in her official capacity). Plaintiffs seek a declaratory judgment that the Ballot Receipt Deadline Statute deprives them of their Constitutional rights and injunctive relief to permanently enjoin enforcement of the Statute. (Dkt. 1 at 11.)

4

Now before the Court is Defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted.[1] (Dkt. 25.) In their motion, Defendants contend that the Court lacks jurisdiction because the Plaintiffs, having suffered no particularized or concrete injury, do not have standing to bring this suit. Defendants also argue that Plaintiffs' claims are barred by the Eleventh Amendment to the United States Constitution. Defendants assert finally that Plaintiffs' suit should be dismissed because Plaintiffs fail to allege plausible claims under 2 U.S.C. § 7, 3 U.S.C. § 1, and the First and Fourteenth Amendments to the Constitution. (Dkt. 25 at 11; 14.)

Plaintiffs disagree and contend that, because state laws in conflict with federal election laws inflict the judicially-cognizable injury of endangering the right to vote, they do indeed have standing. (Dkt. 43 at 4.) Plaintiffs also argue that their candidacy-related injuries are independently sufficient to confer Article III standing,

---

[1] On November 8, 2022, the Democratic Party of Illinois ("DPI") filed a notice of appeal of the Court's order denying DPI's motion to intervene. (Dkt. 59.) At first glance, that pending appeal might suggest that this Court must wait for the Court of Appeals to resolve the appeal before adjudicating Defendants' motions. But a notice of appeal does not completely divest this Court of its jurisdiction over the case. As the Supreme Court held in *Griggs v. Provident Consumer Disc. Co.*, the filing of a notice of appeal "divests the district court of its control over those aspects of the case involved in the appeal." 459 U.S. 56, 58 (1982). If the appeal does not concern the underlying merits of the case, the district court is not divested of its jurisdiction over the merits. *See Kilty v. Weyerhaeuser Co.*, 758 F. App'x 530, 532–533 (7th Cir. 2019). DPI's interlocutory appeal concerned only its effort to intervene, not the underlying merits. Accordingly, this Court retains jurisdiction to address the motion to dismiss. To be sure, the Court presumes it possesses the discretion to await resolution of the pending appeal before proceeding to the merits. But imposing an ersatz stay would be imprudent for several reasons: *first*, no party has asked for a stay; *second*, the relief set forth in this ruling is aligned with the stated interests of DPI as amicus curiae and putative intervenor (*see, e.g.,* Dkt. 13, 56); *third*, the Court is now prepared to issue this substantive ruling and to enter a judgment of dismissal; and *fourth*, the parties' substantive motions have already been pending for a substantial period. Accordingly, the Court will proceed to the merits despite the pending appeal of nonparty DPI.

as the unnecessary expenditure of campaign money is both concrete and particularized. As for the Eleventh Amendment, Plaintiffs maintain that the "plan of the Convention" doctrine renders the Eleventh Amendment inapplicable. Finally, Plaintiffs insist that they have pleaded a viable claim based on Illinois law permitting voting beyond Election Day in violation of federal election law. These arguments are addressed in turn.

## II.    STANDARD OF REVIEW

### A.    Standing

It is a truism that Article III of the Constitution requires an actual case or controversy between the parties. *Deveraux v. City of Chicago*, 14 F.3d 328, 331 (7th Cir. 1994). As part of that requirement, plaintiffs seeking to have a case heard in federal court must demonstrate that they have standing to sue. In particular, plaintiffs must show (1) that they suffered a concrete and particularized injury in fact; (2) a causal connection between the injury and the challenged conduct of the defendant; and (3) that the injury will be likely redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Because "[s]tanding is an essential component of Article III's case-or-controversy requirement," defendants may seek the dismissal of nonjusticiable claims through a Rule 12(b)(1) motion for lack of subject matter jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561).

A Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction over the case. Fed. R. Civ. P. 12(b)(1); *Meyer v. St. John's Hosp. of the Hosp. Sisters of the*

*Third Order of Sta. Francis*, 164 F. Supp. 3d 1083, 1085 (C.D. Ill. 2016). Rule 12(b)(1) "provides for dismissal of a claim based on lack of subject matter jurisdiction, including lack of standing." *Stubenfield v. Chicago Housing Authority*, 6 F. Supp. 3d 779, 782 (N.D. Ill. 2013) (citing *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856 (7th Cir. 1996)).

**B.     The Eleventh Amendment**

Under the Eleventh Amendment to the Constitution, states (and their officers) are generally protected from suit. As a "general rule," private individuals "are unable to sue a state in federal court absent the state's consent." *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1049 (7th Cir. 2013). That protection extends to state agencies and state officials acting in their official capacities. *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010).

An exception to the Eleventh Amendment's general bar on suits against states and their agencies can be found under the "plan of the Convention" doctrine. *Alden v. Maine*, 527 U.S. 706, 729–30 (1999) (quoting *Principality of Monaco v. State of Mississippi*, 292 U.S. 313, 323–24 (1934)). Under that doctrine, the sovereign immunity afforded to States by the Eleventh Amendment will cease where a "fundamental postulate[] implicit in the constitutional design" begins. *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). Because the Eleventh Amendment confirmed, rather than established, sovereign immunity, the scope of the States' immunity from suit is not demarcated by the text of the Eleventh Amendment

7

itself but rather by fundamental postulates implicit in the design of the Constitution. *Alden*, 527 U.S. at 729–30. In other words, the federal government "is invested with full and complete power to execute and carry out [the Constitution's] purposes," and if a state interferes with that power, that state may not assert sovereign immunity from suit in federal court. *PennEast*, 141 S. Ct. at 2259.

### C.     Motion to Dismiss for Failure to State a Claim

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (cleaned up). In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal conclusions are not. *Id.* at 678–79.

## III.    DISCUSSION

### A.     Plaintiffs Lack Standing to Bring This Suit

To bring a suit in federal court, the party suing must establish that it has

standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish standing, a plaintiff must prove that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Of these three elements, injury in fact is often the most significant hurdle for a plaintiff to clear in the standing analysis. To show injury in fact, Plaintiffs must establish three sub-elements: first, the "invasion of a legally protected interest"; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339. The first sub-element—invasion of a legally protected interest—is largely self-explanatory. The second and third, however, require more discussion. For an injury in fact to be "concrete and particularized," it must affect the plaintiff in a personal and individual way. *Lujan*, 504 U.S. at 560 n.1. For an injury in fact to be actual or imminent, a plaintiff must show that an alleged future injury is "certainly impending," not merely possible. *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409 (2013).

Plaintiffs present three harms that they allege are sufficient to confer standing: the Ballot Receipt Deadline Statute's alleged facial conflict with federal law, vote dilution, and Congressman Bost's injuries as a candidate. Each of these alleged harms and whether they are sufficient to confer Article III standing are addressed in turn.

9

       1.    <u>Alleging Conflict with the Elections Clause Is not a Concrete and Particularized Injury.</u>

Defendants first argue that Plaintiffs do not have standing because the asserted injuries are not sufficiently concrete and particularized. (Dkt. 26 at 5.) Defendants state that Plaintiffs merely assert a disagreement with the Ballot Receipt Deadline Statute and fail to explain why it harms them specifically in a way that differs from Illinois voters generally. (Dkt. 26 at 5, 7.) Plaintiffs respond that their alleged vote dilution injury is sufficiently concrete and particularized. (Dkt. 43 at 5–8.) Plaintiffs also assert that, even if the Plaintiffs' facial challenge to the statute and vote dilution injuries are insufficiently concrete and particularized, they still have standing based on the Congressman Bost's injury. Congressman Bost's campaign-resource injury is, they argue, concrete and particularized because it is specific to Congressman Bost as a candidate. (*Id.* at 8–9.)

To adequately plead an injury in fact sufficient for Article III standing, the alleged injury must be "concrete and particularized." A "generalized grievance" is insufficient to confer standing. If a party's injury is a "grievance shared . . . by all or a large class of citizens," it is generalized and insufficient for standing. *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

A plaintiff cannot show a concrete and particularized injury sufficient for standing by showing a mere "general interest common to all members of the public." *Ex parte Levitt*, 302 U.S. 633, 634 (1937). As the Supreme Court explained nearly 50 years ago, an allegation relating to the general conduct of government is not generally concrete and particularized enough to satisfy the injury in fact requirement. *United*

*States v. Richardson*, 418 U.S. 166, 174 (1974); *see also Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 349 (3d Cir. 2020) ("[P]rivate plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause."). If a plaintiff offers only a generally available grievance about government, claiming only "harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—[the plaintiff] does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74.

One component of Plaintiffs' standing theory is that the Ballot Receipt Deadline Statute conflicts with 2 U.S.C. § 7 and 3 U.S.C. § 1. Plaintiffs' allegations on this score amount to a "general grievance about governance" that is insufficient to confer standing. Plaintiffs do not specify how they, individually, are or will be harmed in a concrete and particularized way by the Statute's alleged facial conflict with the Elections Clause. Instead, they generally allege that the Statute violates the Elections Clause. (Dkt. 1 at 9–10.) Rather than plead specific, personal harms, Plaintiffs merely state that they "have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing 10 Ill. Comp. Stat. Ann. § 5/19-8." (Dkt. 1 at 10.)

Courts faced with similar allegations have rejected plaintiffs' claims that they possessed standing. This type of injury is the kind of generalized grievance that is insufficient to confer standing. In *Lance v. Coffman*, for example, the Supreme Court

considered the challenge of four Colorado voters to the redistricting provision of the Colorado Constitution. Those Plaintiffs alleged that the provision conflicted with the Elections Clause of the United States Constitution. 549 U.S. 437, 441–42 (2007). But the Supreme Court disagreed and explained that a bare allegation that the Elections Clause has not been followed is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past[;] . . . plaintiffs assert no particularized stake in the litigation." *Id.* at 442.

Plaintiffs' complaint echoes the allegations in *Lance*. Plaintiffs' Elections Clause claims allege a general interest that every citizen shares in the proper application of the Constitution and the laws of the United States. *Lujan*, 504 U.S. at 560–61. Seeking relief for this grievance no more "directly and tangibly benefits [Plaintiffs] than it does the public at large" and thus "does not state an Article III case or controversy." *Id.* at 573–74. Put differently, were Plaintiffs (acting as voters) to succeed in making Illinois voting laws comply with federal law, that benefit would redound benefit equally to all voters—not merely to Plaintiffs specifically.

Plaintiffs cite a variety of cases in support of their standing argument (Dkt. 43), but those cases do not squarely address the issue of standing. *See, e.g., Foster v. Love*, 533 U.S. 67 (1997).[2] In particular, Plaintiffs cite *Judge v. Quinn*, which Plaintiffs contend is analogous to this case. Plaintiffs assert that the injuries they allege are "consistent with the injuries that led this Court in 2009 to find that

---

[2] Although those courts reached the merits, thus implying standing to sue in those cases, the Supreme Court has "often said that drive-by jurisdictional rulings of this sort . . . have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

different voters had standing to challenge a special election date chosen to fill the Senate seat vacated by then-President-elect Obama." (Dkt. 43 at 6) (citing *Judge v. Quinn*, 623 F. Supp. 2d 933, 934 n.3 (N.D. Ill. 2009)). But the court in *Judge* did not undergo an extensive standing analysis—standing was instead relegated to a single footnote in which the court said it "concur[red] with the parties' apparent agreement that plaintiffs have standing." *Id.* This brief acknowledgment of standing is the exact kind of drive-by jurisdictional ruling that the Supreme Court has cautioned courts to avoid treating as precedential. *Citizens for a Better Env't*, 523 U.S. at 91. Accordingly, *Judge* does not show that Plaintiffs have standing.

Plaintiffs' claims are, in any event, distinguishable from those in *Judge*. Those plaintiffs challenged then-Governor Quinn's decision to allow Roland Burris, who was specially appointed to fill a vacancy in the United States Senate, to remain in office until the next regular election rather than conducting a special election to elect a replacement senator. *Id.* at 934. As *Judge* reflects, the plaintiffs were concerned about being denied entirely the right to vote for their representative in the Senate—not that their votes in a federal election were being diluted. Further, the plaintiffs did not allege any sort of vote fraud. Because the *Judge* plaintiffs were challenging the outright denial of their right to vote, rather than bringing a claim that their votes were diluted by the allegedly fraudulent votes of others, *Judge* is distinguishable.

Plaintiffs' contention that the Ballot Receipt Deadline Statute inflicts an injury sufficient to confer Article III standing fails because it is not specific to Plaintiffs. The alleged conflict with the Elections Clause is same kind of injury that the Supreme

Court found too undifferentiated to confer standing in *Lance*. Further, the cases Plaintiffs cite to support a finding of standing do not engage in a standing analysis and are factually distinguishable. For all of these reasons, therefore Plaintiffs fail to allege a particularized injury.

        2.      <u>Plaintiffs' Vote Dilution Claim is Insufficient to Confer Standing.</u>

Plaintiffs also allege that the Ballot Receipt Deadline Statue dilutes their votes and state that this alleged harm is sufficient to confer standing. Plaintiffs contend that by counting ballots received after Election Day, their ballots, presumably cast on or before Election Day and received on or before Election Day, are diluted. In contrast, Defendants state that the vote dilution claim is not concrete and particularized enough to meet Article III's requirements.

Plaintiffs' vote dilution claim is similar to the vote dilution claim at issue in *Feehan v. Wisconsin Election Commission*. 506 F. Supp. 3d 596 (E.D. Wis. 2020). In *Feehan*, the Plaintiff alleged that Wisconsin's election policies diluted his vote in violation of the Constitution. More specifically, the plaintiff alleged "massive election fraud" in violation of the Election, Electors, and Equal Protection Clauses of the Constitution. *Id.* at 601. The plaintiffs sought a declaratory judgment that Wisconsin's signature verification violated the Constitution and that mail-in and absentee ballot fraud occurred in the 2020 election. *Id.* at 602. They also sought a permanent injunction prohibiting the Wisconsin governor and secretary of state from transmitting the certified election results to the Electoral College. *Id. Feehan*'s plaintiffs thus maintained that their alleged vote dilution injury was sufficient for

Article III standing. But the *Feehan* court disagreed and held that the injuries claimed were "too speculative and generalized" because they were "injuries that any Wisconsin voter suffers." *Id.* at 609.

Courts outside this Circuit have agreed that claims of vote dilution based on the existence of unlawful ballots fail to establish standing. For example, the district court for the Middle District of North Carolina held that in "vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted," the harm alleged "is unduly speculative and impermissibly generalized because all voters in a state are affected." *Moore v. Circosta*, 949 F. Supp. 3d 289, 312–13 (M.D.N.C. 2020). Although *Moore* did not go so far as to say that no statewide election law could ever be challenged "simply because it affects all voters," *Moore* explained that "the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not the concrete and particularized injury [that is] necessary for Article III standing." *Id.* Unlike gerrymandering claims, "in which the injury is specific to a group of voters based on their racial identity or the district in which they live," all voters would suffer from the vote dilution injury alleged. *Id.* As a result, *Moore* found that the plaintiff had no standing to bring the vote dilution claim.

Plaintiffs' vote dilution claim is effectively the same as the vote dilution claims in *Feehan* and *Moore*. In Count I of the complaint, Plaintiffs allege that "[u]ntimely and illegal ballots received and counted after Election Day pursuant to 10 Ill. Comp. Stat. Ann. § 5/19-8 dilute the value of timely ballots cast and received on or before Election Day, including Plaintiffs' timely cast and received ballots." (Dkt. 1 ¶ 41.)

15

Plaintiffs suggest the dilution posed by the Ballot Receipt Deadline Statute violates the Elections Clause, but, as in *Moore* and *Feehan*, Plaintiffs do not allege an injury beyond the general grievance that all Illinois voters would share if that were the case.

To be sure, the plaintiffs in *Feehan*, unlike here, sought to decertify election results, and thus Plaintiffs argue that their claim is distinct from the underlying claim in *Feehan*. (Dkt. 43 at 11–12). But that is a distinction without a difference, as both the claims here and in *Feehan* are the same on a legal level: they both allege that the election process is "riddled with illegality," thus diluting their right to vote. *Feehan*, 506 F. Supp. 3d at 609.

More broadly, Plaintiffs assert that a ruling for Defendants on the standing issue would give rise to an untenable situation in which voters will never have standing to challenge gross abuses of state power. Plaintiffs compare this case to a situation in which "Illinois granted citizens of France the right to vote in its federal elections." (Dkt. 43 at n.6.) In Plaintiffs' example, were Defendants' reasoning to prevail, the result would be that "no private citizen would have standing to challenge the French ballots." (*Id.*)

Although Plaintiffs' hypothetical concerning illegitimate French voters raises a sincere question about the limits of the doctrine of standing, it ultimately strays too far from the context of this case to be genuinely illustrative. Contrary to Plaintiffs' conceptualization, a vote dilution claim under the Equal Protection Clause is about votes being weighted differently to the disadvantage of an identifiable group. *Bognet*, 980 F.3d at 355. That is, a vote dilution claim is about certain votes being given less

value than others, and such claims typically arise in the context of redistricting disputes. Federal courts have thus declined to apply the doctrine of vote dilution to voter fraud allegations, *e.g., Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. Dec. 9, 2020), because an increase in the pool of voters generally does not constitute vote dilution. Absent any suggestion that our hypothetical, carpetbagging French voters diluted the votes of another identifiable group of legitimate voters, current standing doctrine does not support Plaintiffs' claims. Further, Plaintiffs' hypothetical depends on evidence of illegal votes actually being cast. (Dkt. 43 at 6 n.1.) But Plaintiffs do not allege that any illegal ballots were cast in any election—they merely suggest the possibility of such votes being counted. The lack of any such allegation distinguishes Plaintiffs' allegations from the French voter hypothetical. Put another way, to the extent there is an outer boundary at which the counting of wholly illegal ballots cast by noncitizens amounts to a cognizable claim of vote dilution for which standing would exist, Plaintiffs' claims here do not come close to reaching it.

As in *Feehan* and *Moore*, Plaintiffs' claims here are too speculative and generalized to constitute an injury in fact for the purposes of Article III standing. Accordingly, Plaintiffs lack standing based on their vote dilution theory.

3.   <u>Congressman Bost's Stated Financial Injuries Are Too Speculative to Confer Standing.</u>

In addition to Plaintiffs' vote dilution claims, Congressman Bost alleges that Defendants are depriving him of his right to stand for office by enforcing the Ballot Receipt Deadline Statute. (Dkt. 1 ¶¶ 44–48.) Congressman Bost argues that because he is forced to spend significant resources running his campaign for an additional two

weeks after Election Day, his injury, unlike the other injuries alleged in the complaint, is necessarily concrete and particularized. (Dkt. 43 at 8.) Defendants counter that Congressman Bost's injury, although perhaps concrete, is not particularized because all federal candidates in Illinois are affected by the Statute in the same way. (Dkt. 26 at 9.) Defendants also argue that Congressman Bost's claim is speculative because the claimed effect of the Statute on his ability to win re-election is based on a "chain of possibilities." (*Id.* at 10.)

By its terms, the Ballot Receipt Deadline Statute affects all federal candidates equally. All candidates in Illinois, including Congressman Bost's opponent, are subject to the same Illinois election rules. *See Bognet*, 980 F.3d at 351 (candidate-plaintiff did not have standing when his objection to state election rules applied to all candidates). Congressman Bost does not allege how his right to stand for office is particularly affected compared to his opponents. *Id.* For example, Congressman Bost does not allege that the ballots cast after Election Day are more likely to be cast for his opponent. Because the alleged injury is not particularized to Congressman Bost, it is insufficient to confer standing.

But even if Congressman Bost's financial injury is concrete and particularized, his claim is still speculative. An injury in fact, in addition to being concrete and particularized, must be "actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). In practice, that means that a threatened injury must be "certainly impending" to constitute an injury in fact, not merely "possible." *Id.* For example, a

18

plaintiff cannot "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.* at 416.

Congressman Bost's harm—spending more resources on the election—is not certainly impending. Congressman Bost asserts that he will be forced to spend money to avoid the alleged speculative harm that more ballots will be cast for his opponents. There is, however, no reason to believe that these alleged future expenditures are anything but speculative. *See Bognet*, 980 F. 3d at 352. ("The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm Bognet sought to avoid in making those expenditures was not 'certainly impending'—he spent the money to avoid a speculative harm."); *see also Donald J. Trump for Pres., Inc. v. Boockvar*, 493 F. Supp. 3d 331, 380–81 (W.D. Pa. 2020). It is mere conjecture that, if Congressman Bost does not spend the time and resources to confer with his staff and watch the results roll in, his risk of losing the election will increase. Under the letter of Illinois law, all votes must be cast by Election Day, so Congressman Bost's electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact.

Plaintiffs cite to *Carson v. Simon* to support their argument that Congressman Bost has standing. (Dkt. 43 at 9) (citing *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)). In *Carson*, Minnesota presidential electors challenged a decree issued by the Minnesota Secretary of State that unilaterally rendered the statutorily-mandated absentee ballot receipt deadline inoperative. *Carson*, 978 F.3d at 1054. The district

court found that the electors lacked standing, but the Eighth Circuit reversed. *Id.* at 1059.

*Carson* is distinguishable. Its elector-plaintiffs challenged a consent decree that contradicted state law; they did not (as Plaintiffs do here) seek to challenge a statute passed by the state legislature and signed into law by the governor. *Carson*'s electors were concerned that ballots cast in direct conflict with state law would be counted as legitimate votes. Plaintiffs here acknowledge that ballots received up to fourteen days after Election Day are valid under Illinois state law. In any event, Carson was decided over a dissent, which argued the plaintiffs' claims concerning an " 'inaccurate vote tally' . . . appear[ed] to be precisely the kind of undifferentiated, generalized grievance about the conduct of government that the Supreme Court has long considered inadequate for standing." *Carson*, 978 F.3d at 1063 (Kelly, J., dissenting) (cleaned up). That concern over an undifferentiated grievance based on an inaccurate vote tally rings true here as well. Accordingly, the Court declines to follow *Carson*.

In short, Congressman Bost's alleged financial injury is not concrete and particularized and is speculative. Accordingly, it insufficient to demonstrate standing under Article III.

## B. The Eleventh Amendment Separately Bars Plaintiffs' Suit

Apart from standing, Defendants also argue that the Eleventh Amendment bars Plaintiffs' various claims. (Dkt. 26 at 11.) Under the Eleventh Amendment, a state that does not consent to suit in federal court is immune from most claims, unless

Congress has abrogated its immunity. *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F. 3d 397, 403 (7th Cir. 2018). Such immunity, however, does not exist if "the State consents to the suit or Congress has abrogated their immunity." *Tucker v. Williams*, 682 F. 3d 654, 658 (7th Cir. 2017). Eleventh Amendment immunity from suit in federal court extends to "arms of the state"—meaning state agencies. *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). Under this broad immunity, states and their arms are not generally "persons" subject to suit under 42 U.S.C. § 1983. Defendants thus argue that Plaintiffs cannot sue the Illinois State Board of Elections because it is an arm of the State of Illinois (Dkt. 26 at 11.)

Plaintiffs respond that courts in this District have previously rejected immunity arguments in Elections Clause suits because the Elections Clause falls under the "plan of Convention" exception to Eleventh Amendment immunity. (Dkt. 43 at 13.) Under the "plan of Convention" doctrine, Eleventh Amendment immunity ceases where a "fundamental postulate implicit in the constitutional design" is at issue. *PennEast Pipeline Company, LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). In practice, this means that the federal government has "full and complete power" to carry out the Constitution, and when a state interferes with the exercise of that power, the sovereign immunity defense is not available. *Id.* at 2259.

Plaintiff argues that the Ballot Receipt Deadline Statute directly contradicts Article I, Section 4 of the Constitution. That section establishes that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Nothing on the face of the

Statute runs afoul of this constitutional provision. By implementing the Statute, Illinois is following the constitutional command that states determine the time, place, and manner of elections. In addition, the Statute further does not conflict with the federal mandate that Election Day be held on the Tuesday after the first Monday in November. By counting only mail-in ballots postmarked on or before Election Day, the Statute does not extend the day for casting votes in a federal election. Because the Statute does not conflict with a constitutional provision, it does not fall under the plan of Convention doctrine.

Plaintiffs' cited authority applying the plan of Convention doctrine is distinguishable. *Public Interest Legal Found. v. Matthews*, No. 20-3190, 2022 U.S. Dist. LEXIS 40640 (C.D. Ill. March 8, 2022) and *Illinois Conservative Union et al. v. Illinois et al.,* No. 20-cv-05542, 2021 WL 2206159 (N.D. Ill. Sept. 28, 2021) both center on the National Voter Registration Act (NVRA). In those cases, the courts found that the plan of Convention doctrine applied because, by passing the NVRA, Congress "act[ed] pursuant to its power under the Elections Clause." *Public Interest Legal Found.*, 2022 U.S. Dist. LEXIS 40640 at *4; *see also Ill. Conservative Union et al.*, 2021 WL 2206159, at *6. By acting under this power, Congress superseded all conflicting state laws. Unlike those cases, though, here there is no intervening federal law showing that the Ballot Receipt Deadline Statute conflicts with the Elections Clause. Those cases, therefore, do not govern the outcome here.

Because the Ballot Receipt Deadline Statute does not fall under the plan of Convention doctrine, Plaintiffs' argument that their claims are exempted from

Eleventh Amendment immunity fail. Plaintiffs do not contest that the Illinois State Board of Elections is an arm of the state covered by the Eleventh Amendment and do not argue that any other Eleventh Amendment exception applies. Accordingly, and apart from the issue of standing, the Eleventh Amendment independently bars Plaintiffs' suit.

### C. Plaintiffs Separately Fail to State a Claim Upon Which Relief Can Be Granted

1. <u>Plaintiffs Do not Allege Plausible Claims Under 2 U.S.C. § 7 or 3 U.S.C. § 1.</u>

Assuming Plaintiffs had standing to bring their 2 U.S.C. § 7 and 3 U.S.C. § 1 claims, and further assuming Defendants were not immune under the Eleventh Amendment, Plaintiffs still must state a claim upon which relief can be granted. In their motion to dismiss, Defendants argue that Plaintiffs have failed to do so. Specifically, Defendants contend that, because the Ballot Receipt Deadline Statute does not conflict with either 2 U.S.C. § 7 or 3 U.S.C. § 1, Plaintiffs have not brought a claim upon which this Court can grant relief.

States have wide discretion to establish the time, place, and manner of electing their federal representatives. *United States v. Classic*, 313 U.S. 219, 311 (1941). This broad discretion is subject only to one limitation: the state's system for electing its federal representatives cannot directly conflict with federal election laws on the subject. *Voting Integrity Project, Inc. v. Bomer*, 199 F. 3d 773, 775 (5th Cir. 2000). Under 2 U.S.C. § 7, the date for the election of federal representatives is "[t]he Tuesday next after the 1st Monday in November, in every even numbered year . . . ."

Under 3 U.S.C. § 1, the date for appointing electors is "the Tuesday next after the first Monday in November." Together, these statutes create the federal parameters for state ballot receipt deadlines in federal elections.

Plaintiffs allege that the Ballot Receipt Deadline Statute violates 2 U.S.C. § 7 and 3 U.S.C. § 1 by allowing the state to count votes that are received after Election Day, even if they are postmarked on or before the date of the election or certified before Election Day. (Dkt. 1 at 10.) But the Statute does not contradict 2 U.S.C. § 7 and 3 U.S.C. § 1. As the statute says, all mail-in ballots must be "postmarked no later than election day." 10 Ill. Comp. Stat. Ann. § 5/19-8(c). If a ballot is not postmarked, it must be certified on or before Election Day to be counted. *Id.* Nowhere in the text does the Statute allow ballots postmarked or certified after Election Day to be counted. The question, then, is whether ballots that are postmarked or certified on or before Election Day, but are not received by Election Day, should be disregarded as untimely under federal law.

There is a notable lack of federal law governing the timeliness of mail-in ballots. *See Bognet*, 980 F.3d at 353. In general, the Elections Clause delegates the authority to prescribe procedural rules for federal elections to the states. *See U.S. Terms Limits, Inc. v. Thorton*, 514 U.S. 779, 832–35 (1995). If the states' regulations operate harmoniously with federal statutes, Congress typically does not exercise its power to alter state election regulations. *Bognet*, 980 F. 3d at 353.

In this Court's view, and with due respect to Plaintiffs' contrary view, the Ballot Receipt Deadline Statute operates harmoniously with the federal statutes that

set the timing for federal elections. Many states have post-Election Day absentee ballot receipt deadlines, and at least two states other than Illinois allow mail-in ballots postmarked on or before Election Day to be counted if they are received within two weeks of Election Day. *See* West's RCWA 29A.40.091 (Washington–no receipt deadline for ballots postmarked on or before Election Day); *see also* Utah Code Ann. § 20A-3a-204 (seven to 14 days after the election if postmarked the day before the election). Other states will accept mail-in ballots received seven to 10 days after Election Day. *See* AS § 15.20.081(e) & (h) (Alaska–10 days after Election Day if postmarked on or before Election Day); DC ST § 1-1001.05(a)(10A) (District of Columbia–seven days after the election if postmarked on or before Election Day); NV Rev Stat § 293.317 (Nevada–by 5:00 P.M. on the seventh day after Election Day if postmarked by Election Day); R.C. § 3509.05 (Ohio–10 days after the election if postmarked by the day before Election Day). Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013) ("There is good reason for treating Elections Clause legislation differently: The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to 'make or alter' state election regulations.").

Moreover, the Ballot Receipt Deadline Statute is facially compatible with the relevant federal statutes. By counting only these ballots that are postmarked no later than Election Day, the Statute complies with federal law that set the date for Election

Day. As the United States notes in its statement of interest in this case (Dkt. 47), even federal laws governing elections allow ballots received after Election Day to be counted. (Dkt. 47 at 1.) For example, the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 52 U.S.C. §§ 20301–20311, sets out various requirements for states to ensure that military voters overseas can cast ballots in federal elections. And the United States Attorney General often seeks court-ordered extensions of ballot receipt deadlines to ensure that military voters are not disenfranchised. (*Id.* at 12.) These longstanding efforts by Congress and the executive branch to ensure that ballots cast by Americans living overseas are counted, so long as they are cast by Election Day, strongly suggest that statutes like the one at issue here are compatible with the Elections Clause. (*Id.* at 10.) Because the Statute does not facially conflict with the federal election law, Plaintiffs have failed to state a viable facial challenge to the Statute based on federal law.

2. <u>Plaintiffs Do Not Allege a Plausible Violation of Their First or Fourteenth Amendment Rights</u>

Plaintiffs also allege that their First Amendment right to vote and right to stand for office is violated by the Ballot Receipt Deadline Statute. (Dkt. 1 at 8–9.) Even accepting all of Plaintiffs' allegations as true, which the Court must do, Plaintiffs fail to allege a plausible claim that the Statute affects their rights to vote and stand for office.[3]

---

[3] Both parties dedicate significant argument to discussing whether the *Anderson-Burdick* standard should apply to this case, and if so, what the outcome should be under that test. *Anderson-Burdick* applies when a facially valid law placing restrictions on voting impermissibly burdens the right to vote. *Serv. Emps. Int'l Union, Loc. 1 v. Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012) ("[W]hen the state places a 'substantial' burden on the

   *a. Plaintiffs fail to state a vote dilution claim upon which relief can be granted.*

As explained above, Plaintiffs' vote dilution claim rests on a theory that, if mail-in ballots received after Election Day are counted, then Plaintiffs' votes, presumably cast on or before Election Day, are diluted by the late and invalid votes. (Dkt. 43 at 20.) Counting the votes of others, however, does not infringe on Plaintiffs' right to vote.

Under the Equal Protection Clause of the Constitution, the right to vote is protected in two ways. First, a state violates the Equal Protection Clause when it, having "once granted the right to vote on equal terms," through "later arbitrary and disparate treatment, value[s] one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Second, the Equal Protection Clause requires states to ensure that no class of voters receives preferential treatment. *Gray v. Sanders*, 372 U.S. 368, 379–80 (1963). To prove a violation of the Equal Protection Clause under the second theory, a plaintiff must show that there is "arbitrary and disparate treatment." *Bush*, 531 U.S. at 105.

Plaintiffs do not plausibly allege an Equal Protection Clause violation under either theory. If ballots cast by mail and postmarked by Election Day are counted, no single voter "is specifically disadvantaged," even if the votes counted in compliance with the Ballot Receipt Deadline Statute have a "mathematical impact on the final

---

right to vote—one that is greater than a 'reasonable, nondiscriminatory restriction' but less than a 'severe burden'—courts apply the Anderson/Burdick test."). Because the Ballot Receipt Deadline Statute does not restrict the right to vote, the *Anderson-Burdick* test does not apply here.

tally and thus on the proportional effect of every vote." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). Plaintiffs' votes are no more diluted than they would be if "get-out-the-vote" efforts were particularly successful and more people than anticipated voted in person at the polls. Another voter exercising his or her constitutional right to vote does not affect the value of a different voter's ballot. A voter is not guaranteed to have their vote be decisive or to have their vote be for the ultimate winner of an election. On the contrary, a voter has a right to cast a lawful ballot and have that lawfully cast ballot counted. Nothing in the Statute infringes on that right, and Plaintiffs do not allege any facts that suggest their ability to cast a lawful ballot is negatively affected by the Statute. Unlike the facts in other vote dilution cases in which plaintiffs were harmed because the voting process was marred by overt fraudulent practices like ballot stuffing, Plaintiffs' votes here are not diluted by other valid, lawfully cast votes. *See, e.g., United States v. Saylor*, 322 U.S. 385, 386 (1944).

Plaintiffs also do not allege the presence of arbitrary and disparate treatment. Plaintiffs bring only a facial challenge to the Ballot Receipt Deadline Statute. Put differently, for Plaintiffs' as-pleaded theory to be plausible, it would have to be possible for the statute, as it is written, to allow Illinois election officials to count mail-in ballots that are cast after Election Day. But the text of the Statute does not permit that result. All ballots cast by Election Day are treated the same under the Statute's plain text. Untimely ballots, *i.e.*, those not cast on or by Election Day, are not counted.

28

More broadly, Plaintiffs consistently—and wrongly—conflate "voting" with "counting votes." The word "voting" as used in this case is a gerund; that is, a word derived from a verb that functions as a noun. As a derivative of the verb "to vote," "voting" refers to a specific act: casting a vote. Under the Ballot Receipt Deadline Statute, the voting deadline is unambiguous: the act of voting must take place on or before Election Day. 10 ILCS § 5/19-8(c). *Counting* those votes, however, may take place up to 14 days after Election Day. *Id*. Voting (as an act) and counting votes (as a separate act) are not the same thing, and the Statute allows counting alone—not voting—to continue after Election Day.

It is, of course, possible that election officials could be improperly applying the Ballot Receipt Deadline Statute and improperly counting late votes. But Plaintiffs do not allege this in their complaint. If Plaintiffs came to believe that election officials, in applying the Statute, were illegally counting invalid votes, then Plaintiffs might have a separate claim (and one that could likely be presented to an Illinois state court). But Plaintiffs do not allege fraudulent vote counting; they allege only that the Statute facially allows "late votes" to be counted. As explained above, nothing in the text of the Statute supports that conclusion. Plaintiffs thus fail to state a vote dilution claim upon which relief can be granted.

      b.    *Plaintiffs do not plausibly allege that the Ballot Receipt Deadline Statute impinges on the right to stand for office.*

Finally, Plaintiffs allege that the Ballot Receipt Deadline Statute impinges on the right to stand for office. As the Seventh Circuit has explained, the right to stand for office "is to some extent derivative of the right of the people to express their

29

opinions by voting." *Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004). But the right to stand for office is not absolute, and the Constitution gives states the "broad authority to regulate the conduct of elections." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 1997). If a state is regulating the "Times, Places, and Manner of holding Elections for Senators and Representatives" under Article I, Section 4, clause 1 of the Constitution, that regulation cannot be said to infringe on the right to stand for office. *See generally Tripp v. Scholz*, 872 F.3d 857, 862–863 (7th Cir. 2017).

Plaintiffs allege that the Ballot Receipt Deadline Statute forces Congressman Bost and other candidates "to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." (Dkt. 1 ¶ 46.) Plaintiffs do not, in connection with their right to stand for office claim, explain why the Statute constitutes an invalid regulation of the times, places, and manner of federal elections. Instead, Plaintiffs merely set forth their reasons why the Statute could make standing for federal office in Illinois more challenging.

These allegations do not assert a plausible claim that the Ballot Receipt Deadline Statute impairs the right to stand for office. Spending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the Statute prevents them from standing for office at all. For these reasons, Plaintiffs' "right to stand for office" claim is unavailing.

## IV. CONCLUSION

Plaintiffs lack standing to sue, the Eleventh Amendment is a bar to suit, and the Complaint fails to state a claim upon which relief can be granted. Defendants' motion to dismiss is therefore granted, and the case is dismissed. Because the principal basis for dismissal is a lack of jurisdiction based on standing, this dismissal is without prejudice. *See McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 533 (7th Cir. 2022) (dismissals based on lack of subject matter jurisdiction and Eleventh Amendment immunity must be without prejudice).

SO ORDERED in No. 22-cv-02754.

Date: July 26, 2023

_____

JOHN F. KNESS
United States District Judge